PINE BLUFF PRODUCTION CREDIT ASSN. AND
WHITEOAK ENTERPRISES, INC. *v.* H. G. LLOYD
AND MARY F. LLOYD, HUSBAND AND WIFE, HERSHEL
LEON LLOYD AND McGEHEE HATCHERY &
POULTRY FARMS, INC.

5-5598                                    480 S.W. 2d 578

Opinion delivered May 22, 1972

[Rehearing Denied June 26, 1972.]

*Bridges, Young, Matthews & Davis,* for appellants.

*James A. Ross* and *James A. Ross, Jr.,* for appellees and appellants H. G. Lloyd et al; *Smith & Smith,* for appellee Ralston Purina Co.

CHAS. A. WALLS, JR., Special Justice. This litigation was the result of several financial transactions between the Appellant, Pine Bluff Production Credit Association, herein referred to as PCA and the Appellees and Cross-appellants, McGehee Hatchery and Poultry Farms, Inc., an Arkansas corporation, and H. G. Lloyd, Mary F. Lloyd and Hershel Leon Lloyd, herein referred to as McGehee Hatchery and the Lloyds. The PCA was engaged in the business of making agricultural operating loans and the Lloyds were engaged in the business of operating a chicken hatchery and hen houses for commercial production of eggs, including the processing of eggs for sale. This business was located in McGehee, Arkansas.

The Appellant, PCA, made loans to the Appellees and Cross-complainants; the first in June of 1966 for $225,-000.00; the second in October of 1966 for $90,000.00; and the third in July of 1967 for $79,000.00. At the time the foreclosure action was filed on July 22, 1969, the note evidencing the first loan had been paid. However, this note was past due when paid. Trial on the $90,000.00 note and $79,000.00 note was commenced on the 16th day of March, 1970, in the Chancery Court of Desha County, McGehee District, and the submission of evidence was completed on April 18, 1970. The Trial Court entered its "Summarized Findings and Conclusions" on the 13th day of August, 1970, and the Decree was filed September 3, 1970.

The Summarized Findings and Conclusions as filed States:

"1. PCA should have judgment against Lloyds for the amount sued for in its complaint and amendments.

2. Lloyds should have judgment on their counter-claim and cross-complaint against PCA and White-oak as damages for the amount of the judgment mentioned in Part 1.

3. The notes and mortgages and security instruments sued on herein by PCA should be cancelled and removed as cloud from the properties of Lloyd.

4. The solicitor for PCA should draft precedent for decree in accordance with these findings and submit the same to the solicitor for Lloyd for approval as to form.

Dated: August 12, 1970

/s/ James Merritt
Chancellor"

The decree, which obviously was not prepared by the solicitor for the PCA, awarded the PCA a judgment for the balance due on the October 5, 1966, note and a judgment for the full amount on the July 19, 1967, note, together with interest for a total amount as of September 1, 1970, of $170,025.71. The decree also contained a judgment in favor of PCA for the sums expended by it for insurance premiums upon the life of H. G. Lloyd in the amount of $5,945.50, or a total judgment as of September 1, 1970, in the amount of $175,971.21, with a credit for stock in PCA of $11,250.00 or a net judgment as of September 1, 1097, in the sum of $164,721.21.

There being no issue in regard to this part of the judgment it should be affirmed and the liens sought in the complaint established in favor of PCA and the ministerial acts of completing the foreclosure of these liens should be completed.

The Trial Court granted judgment against PCA in the sum of $55,150.24 for loss of feed purchased; $16,000.00 loss on egg sales; $59,894.50 damages from sale of hens; $20,320.30 rental on real property, houses and equipment; and the sum of $21,000.00 damages for waste on premises and equipment, aggregate being $172,365.04, with interest at 6%. An attorney fee of $7500.00 was ordered paid by the Appellees, McGehee Hatchery and the Lloyds, to the PCA attorneys. These parts of the decree constitute the points in issue on this appeal.

The McGehee Hatchery, an Arkansas corporation with its stock being owned within the family and Oscar Lee Lloyd, a brother, was located in McGehee, Arkansas. The business was operated by H. G. Lloyd, his sons, Hershel Leon Lloyd and Charles Lloyd, and his brother, Oscar Lee Lloyd. They were engaged in the production of eggs commercially and in other phases of the chicken and egg industry. H. G. Lloyd and his sons lived in homes that adjoined the hatchery and real estate.

H. G. Lloyd started this business in the late 1940's and had expanded so much the local banks could not furnish the capital desired by the Lloyds in the operation of the business. The Lloyds and McGehee in 1966 sought financing from PCA because they needed capital that exceeded the limit that could be furnished by the Dermott State Bank. In June 1966 the $225,000.00 loan was obtained from PCA and on October 5, 1966, an additional loan of $90,000.00 was obtained by McGehee from PCA.

At this time McGehee was operating a feed mixing mill, chicken hatchery, hen houses for egg production and egg processing facilities. They were hatching chicks under contract for Arkansas Valley, Inc., which sold chicks and feed. The feed mill of Arkansas Valley, Inc., burned in May of 1967 and McGehee discontinued this part of the hatchery operations. At this time the egg market was getting into a depressed period and the cash flow was diminishing. Ralston Purina, a commercial feed company, negotiated an agreement with McGehee where it would furnish the feed and help market the eggs, PCA would make an additional loan to place chicks

in the houses. This was in June and July, 1967. PCA made the loan of $79,500.00 on July 19, 1967, for the purchase of the chicks and fulfilled their part of the agreement.

In May of 1968 the egg market was still in a depressed condition. Ralston Purina changed credit managers and stopped making the payments, which were part of the 1967 agreement, to PCA; PCA became concerned and arranged a meeting with Ralston Purina representative, H. G. Lloyd and Hershel Leon Lloyd; this was in June of 1968. Some changes were made in the agreement, including the change where all proceeds from the sale of eggs were to go to Ralston Purina. Hershel Leon Lloyd, the son who actually had managed the business, took another job on September 18, 1968, because the hens had depleted to a level he could not justify his employment.

McGehee and Lloyds under the existing loan agreements were committed to pay $11,000.00 monthly on PCA loan. After the meeting in May of 1968 by agreement the PCA payment was reduced to $5500.00 monthly. Purina was furnishing the feed and was to receive proceeds from egg sales, except locals. Purina was to pay PCA and McGehee on the basis of each dozen sold.

The McGehee egg production was what is called a floor operation; the hens being kept on the floor rather than on wire. There were nests and the hens would jump up into the nests to lay the eggs. They had automatic feeders and waterers. This floor operation, which is not used anymore, takes more labor and results in more dirty and stained eggs.

In October of 1968 H. G. Lloyd, the father, was in poor health. He had been in poor health for about two years. He had emphysema which was aggravated by the dust in the hen houses and was not able to go in the houses. His son Charles had been employed elsewhere Since June of 1968 and his son Hershel Leon had not worked at the Hatchery since the 18th day of September, 1968. His brother Oscar Lee Lloyd was helping and was ac-

tually managing the business. H. G. Lloyd, in October of 1968, called Danny Bourland, then manager of PCA, and advised him he was not feeding the hens any longer. Mr. Bourland immediately went to McGehee and found the above situation.

After several conferences between Bourland and H. G. Lloyd, it was determined best to dispose of the hens. Bourland sent buyers to H. G. Lloyd and a sale was consummated for the hens. They were purchased by Whiteoak and the hens were to lay out on the premises. This was in October of 1968. The action on the notes and for foreclosure of the liens was filed in July of 1969.

On appeal the first question involves the findings of fact by the Chancellor. The Court has since its announcement followed the rule laid down in *Leach* v. *Smith,* 130 Ark. 465, where it stated:

> "The rule was early announced and has been consistently adhered to that the findings of the Chancellor will not be set aside by this Court unless they are clearly against the preponderance of the evidence. This simply means that on a trial anew of the issues of fact in a Chancery cause on the record as presented to this Court on appeal, unless it is clear to our minds, that is, unless we are fully convinced as to which of the parties litigant is entitled to the decision, we accept and adopt the findings of the chancellor as our own and treat them as conclusive. The meaning of the rule may be shown by this simple illustration: When Chancery causes are taken up for determination by this Court, the judicial balance, so to speak, stands at perfect equipoise. One side of the scales is labeled "appellant," the other "appellee." The testimony in the record is examined and all that is incompetent is discarded. That which remains for appellant is put on his side, and that for the appellee is put on his side, and if the scales are evenly balanced, or so nearly so as to leave the judges in doubt as to where lies the greater weight, the the decision of the Court below is persuasive and is allowed to stand as the correct result.

While the rule has been stated in different forms and in somewhat different language in various decisions of this Court, the above we believe correctly states and illustrates the rule that the Chancery causes are tried de novo in this Court and that the findings of fact by the Chancery court are allowed to stand unless they are clearly against the preponderance of the evidence." *Leach* v. *Smith,* 130 Ark. 465; *State Bank* v. *Conway,* 13 Ark. 350; *Ringgold* v. *Patterson, 15 Ark. 209; Woodruff* v. *Core,* 23 Ark. 341; *Gerson* v. *Pool,* 31 Ark. 85; *Chapman* v. *Liggett,* 41 Ark.292.''

After a careful review of the record, which consists of 1076 pages of testimony and 318 pages of exhibits and pleadings, this Court is unable to conclude that the findings of fact are not clearly against the preponderance of the evidence on the cross-complaint and counter-claim of McGehee and Lloyds.

On appeal in this case the first matter presented to the Court involved the findings of fact by the Chancellor. From the testimony in the record we find that the son, Hershel Leon Lloyd, on direct examination was the only witness to testify that the Production Credit Association closed the first feed mill; however, the record clearly reflects the reason that the feed mill was closed, if closed, and there was evidence that it never closed, was the result of the agreement entered into with Ralston Purina Feed Mills. This agreement, which was entered into in 1967, was one of the methods the appellee used to obtain additional financing.

When appellees were operating the feed mill, it was required of them to pay cash for the ingredients. By purchasing the mixed feed from Ralston Purina, the appellees could get the feed and not pay for it until later. Purina was extending credit for the feed. There was no need for continuing the operation of the feed mixing mill as Purina was furnishing the mixed feed on credit. The simple, unsupported statement from one witness will not of itself alone be considered a preponderance of the evidence where there are many witnesses and the record as a whole reflects contrary evidence.

From all of the testimony in the record no conclusion can be reached except that the PCA had no control or influence over the closing of the feed mixing mill or the sale of the eggs.

The findings of the Chancellor:

"That prior to June 1, 1967, McGehee owned and operated its own feed mill for its laying hens and on or about said date plaintiff through its agent, Danny Bourland, required defendant to close its feed mill and purchase feed from commercial feed company at prices much greater than defendant could have produced its own feed. The difference between cost of feed purchase was $55,150.24, more than it would have cost defendant to produce its own feed and defendant should be awarded a judgment for that amount as damages against PCA and

[The findings] that about June 1, 1967, PCA by its agent, Danny Bourland, required McGehee to sell eggs at markets other than those selected by the defendant and defendant having its own market was damaged by lower prices received for its eggs sold on markets not selected by it. The difference between what defendant could have received for eggs sold on local markets and lower markets at which eggs were sold from June 1, 1967, until November 1, 1968, amounts to $16,000.00 and said defendant should be awarded judgment against PCA for $16,000.00"

are not supported by the testimony of the witness or the exhibits in the record.

McGehee Hatchery's principal witness on the sale of eggs was Leon Lloyd, who testified:

"Q. Did Mr. Bourland at that meeting or did he at any later meeting ever tell you where to sell your eggs?

A. No, I don't believe that Danny Bourland told us where to sell our eggs. I think that he left this

portion of the agreement to Purina's judgment, I believe."

In regard to the findings of the Chancellor on the closing of the feed mill and sale of eggs, we find no conflict in the testimony with the evidence against these findings.

H. G. Lloyd testified in regard to selling the eggs to Jersey Coast market.

"Q. You knew one thing for sure that he didn't have any contract with you.

A. I knew that, you darn right.

Q. And you weren't about to sell your eggs there if you wanted to sell them somewhere else, were you.

A. If I could beat it.

Q. And you did.

A. Not at that time. Later I did."

Of greater concern to this court is the portion of the appeal relating to the findings by the Chancellor:

"That on or about November 1, 1968, PCA, by its agent, Danny Bourland, sold all hens owned by McGehee on which plaintiff held security interest. Plaintiff did not make said sale pursuant to law relating to foreclosure of security interest in personal property and is liable in damages arising out of said sale. Plaintiff sold hens without consent of McGehee and did not proceed in accordance with UCC procedure for foreclosing security interest in disposing of hens and failed to send reasonable notice of sale. Disposition of hens was not commercially reasonable in accordance with Ark. Stat. Ann. 85-9-504. Judgment for defendant for $49,994.50 on 56,000 hens and $9900.00 on 9000 hens."

The preponderance of the testimony reveals the sale of the hens, which occurred in October of 1968, was proximately the result of the sons, Charles Lloyd and Leon Lloyd, having left the business and Mr. H. G. Lloyd's poor health preventing him from carrying on the operation. Oscar Lee Lloyd, a brother of H. G. Lloyd, was taking care of the business.

At the same time the hens were sold to Whiteoak Enterprises by H. G. Lloyd, the president of McGehee, the sale had been discussed with his wife and son, Leon. At this time H. G. Lloyd, among other things, was suffering with emphysema and could not go in the hen houses. The egg market was still depressed. He had no operating capital. The only key personnel left was his brother, Oscar Lee. The flock was approaching being a border between salvage and molt. There were no replacement birds available. They owed Purina about $100,-000.000; PCA around $180,000.00, and the Bank of McGehee.

The facts surrounding the sale of the hens began when H. G. Lloyd called Mr. Bourland, who was with the Pine Bluff PCA, and advised Bourland that he was not feeding the hens anymore. When this occurred, Mr. Bourland visited with Mr. H. G. Lloyd, who requested Mr. Bourland to assist and protect the security in the sale of the birds. Mr. Bourland, in an effort to help in the sale of the hens, in compliance with Mr. Lloyd's request, and in order to preserve the security, made a number of contracts about the sale, and the evidence clearly reflects that Mr. H. G. Lloyd entered into an agreement with Whiteoak for the sale of the birds after considerable negotiating.

The appellees contend that PCA sold the hens to Whiteoak Enterprises and the sale was made without the consent or authorization of McGehee at a price less than the market value.

The Chancellor found that PCA by its agent, Danny Bourland, sold all the hens owned by McGehee that PCA

held a security interest on. The question became one of "Who sold the hens?"

PCA contends, and the evidence supports this contention, that Danny Bourland actively sought buyers for the hens, referred them to Mr. H. G. Lloyd and finally in late October of 1968, a contract of sale was entered into between McGehee Hatchery and Whiteoak.

Leon Lloyd, who was no longer with the business at the time of the sale of the hens, testified on direct examination, in his first appearance as a witness, that he did not know anything about the sale of the hens and had nothing to do with it. At a later date on cross-examination he testified he was against selling the hens to Whiteoak and told his Dad. This was the day he showed the hens to Mr. Treat, of Whiteoak, while his father was talking to Mr. Foster, of Whiteoak.

There is no question Bourland actively sought buyers for the hens. Sherland, a banker who appeared as witness for appellee, testified he would have done this had the loan been with his bank. All of the buyers Mr. Bourland referred to McGehee testified Mr. Bourland advised them they would have to make the purchase from Mr. Lloyd. The sale was made to Whiteoak by Mr. H. G. Lloyd, who was the real owner of McGehee. There is no question Mr. Bourland actively participated in the sale by acting as a go-between. All of the prospective buyers, including the purchaser, testified to this fact. Mr. Bourland was not present when the details of the final negotiations were worked out. The evidence does reflect that Oscar Lee Lloyd was employed by the purchaser as manager of the operation of Whiteoak at the McGehee Hatchery location. The purchaser left the hens at the McGehee Hatchery at the request of Mr. H. G. Lloyd, in order to make a sale of the business and realty easier, which could have more value as a going business. He continued the employment of the employees as requested by Lloyd. Mrs. Lloyd even testified she heard her husband tell Bourland to sell the hens. Mr. H. G. Lloyd was the only witness to testify that he did not sell to Whiteoak. There were many discrepancies in his testimony such as: he testified

Mr. Lowe worked for him. Mr. Lowe testified they could have worked out something for him to work for Mc-Gehee had Mr. Lloyd not sold to Whiteoak. He denied calling Bourland and telling Bourland he was not going to feed the hens another day on direct examination, but on cross-examination admitted he might have said he was not going to feed the hens another day, but did not mean it that way, only was trying to get some more money. Mr. Lloyd testified he did not agree to the sale of the hens. Mr. Thorp, Mr. Bourland, Mr. Treat, Mr. Foster, and Mrs. Lloyd all testified that Mr. H. G. Lloyd sold the hens and agreed to the sale. The existing circumstances surrounding the entire transaction are such that the preponderance of the evidence on who sold the hens falls on the finding of fact that H. G. Lloyd made the sale.

The question of notice of the sale and commercial reasonableness of the sale under Ark. Stat. Ann. Sections 85-1-201 and 85-9-504 (3) become immaterial as H. G. Lloyd either agreed to or made the sale. This Court has not had before it the question of notice of sale and commercial reasonableness of the sale where the sale involved collateral which was perishable or threatened to decline speedily in value.

The lower Court entered judgment against PCA for rental on the real property, houses and equipment, in the sum of $21,000.00

H. G. Lloyd having made the sale of the hens to Whiteoak, rental, if any, would be due from Whiteoak. The facts as they appear in the testimony do not involve PCA in the rental for the use of the real property, house and equipment. The undisputed testimony was that for the Selma farm, upon which PCA had no mortgage, McGehee sought 1¢ per square foot per month rent after McGehee put wire in to get the hens off the floor. Whiteoak did not rent but moved the hens. Mr. H. G. Lloyd at one time told Mr. Foster, with Whiteoak, to pay him, Mr. Lloyd, four or five dollars a month for the used of the buildings. There was no mention of rent at

the time of the agreement as Mr. Lloyd wanted the hens to lay out where they were located. There is no evidence that PCA rented the real property, houses and equipment. The bill that was sent for rent was sent to Whiteoak.

The appellee contends that Whiteoak took possession of the premises and at this time PCA was a mortgagee in actual physical possession of the property by and through Whiteoak. This contention is not supported by the evidence.

The rule adopted by the Court in *Caldwell* v. *Hall,* 49 Ark. 508, that a mortgagee in possession is liable for all rents collected or that could be collected by ordinary diligence and must apply them in discharge of the mortgage debt, unless otherwise applied by agreement. *Donham* v. *Lack,* 200 Ark. 445, has no application to the facts.

Here PCA was never in possession of the houses, property or equipment. Whiteoak was in possession of the mortgaged property to the extent of using some of the hen houses. Oscar Lee Lloyd used some of the property and equipment and paid rent to H. G. Lloyd.

Whiteoak used the egg graders and tried to pay H. G. Lloyd. Lloyd sent Whiteoak a statement for rent. The agreement made between H. G. Lloyd and Whiteoak about the use of the hen houses did not include the mortgagee, PCA.

The lower Court entered a judgment against PCA for rental on the real property, houses and equipment. There is no evidence PCA was ever in possession of the real property, houses and equipment and no judgment against Whiteoak which was in possession. There was no appeal from this part of the judgment by McGehee and Lloyd.

The last part of the monetary findings against PCA to offset the judgment of PCA against the Lloyds and McGehee involves alleged damage to the facilities and premises. This part of the judgment grants judgment

against PCA in the sum of $21,000.00 damages for waste on premises and equipment.

Part of the agreement made between H. G. Lloyd and Whiteoak was for Whiteoak to employ Oscar Lee Lloyd, stockholder in McGehee and brother of H. G. Lloyd. Oscar Lee Lloyd was employed by Whiteoak to manage the operation at McGehee while Whiteoak was laying out the hens purchased from McGehee. The testimony is undisputed that Oscar Lee Lloyd as local manager had the full authority to make any and all repairs he felt necessary for the upkeep of the houses and equipment.

Whiteoak was in possession under agreement with H. G. Lloyd with a stockholder of McGehee managing the operation. The judgment against PCA which did not have possession and could not have committed waste on premises and equipment.

The judgment on the cross-complaint and counter-claim of McGehee and Lloyds against PCA is reversed.

The mortgage and security interest liens of PCA on the real and personal property are found to be first and prior liens on the property therein described and if the judgment is not paid within the time fixed by the Court then the property should be sold to apply toward the satisfaction of the judgment.

The attorney fee of $7500.00 is inadequate for the obvious time that has been involved in this litigation. The record consists of 1076 pages of testimony and 318 pages of pleadings and exhibits. The attorney fee for the attorneys for the PCA is fixed at $16,400.00

The action of the lower Court in amending the decree filed September 3rd deleting therefrom the paragraph that invalidated the lien of Ralston Purina is affirmed.

The complaint only put in issue the priority of the liens. McGehee and Lloyds in their pleadings only raised

the issue of the validity of PCA mortgages and security interest.

The validity of the Ralston Purina mortgage and security interest was never in issue.

BYRD, J., disqualified and not participating.

HOLT, J., disqualified and not participating.

Special Associate Justice EUGENE A. MATTHEWS, sitting in his stead.