IN RE: Matthew KNIGHT and Susan E. Knight, Debtors.

Case No. 4:14–bk–15194

United States Bankruptcy Court, E.D. Arkansas, **Little Rock Division.**

Signed 01/27/2016

Jeremy Bueker, G. Gregory Niblock, Niblock & Bueker, Stuttgart, AR, for Debtors.

Fletcher C. Lewis, McCrory, AR, for Bank of McCrory.

Roger McNeil, Womack Law Firm, Jonesboro, AR, for Crop Production Services, Inc.

## ORDER OVERRULING OBJECTIONS TO CLAIMS

Phyllis M. Jones, United States Bankruptcy Judge

Before the Court are the objections of Matthew and Susan E. Knight (collectively, "**Debtors**") to Claims 3, 4, 5, and 6 filed by the Bank of McCrory ("**Bank**") in this Chapter 13 case. (Debtors' Objections to Claims 3, 4, 5 & 6, Doc. No. 75). The basis of the Debtors' objections is that a sale of their collateral by the Bank was not commercially reasonable.

The Debtors have filed multiple objections to the Bank's claims in this bankruptcy case. On March 31, 2015, the Court conducted a hearing on the Debtors' initial objections to the Bank's claims and the Debtors' amended objections to the Bank's claims to determine whether the claims were properly classified as unsecured. (Debtors' Objections to Proof of Claim Nos. 3, 4, 5 & 6, Doc. Nos. 19, 21, 23, & 25; Debtors' Am. Objections to Claims 3, 4, 5 & 6, Doc. No. 33).

At the March 31, 2015 hearing the Debtors reserved their right to object to the claims on the additional basis of whether the sale of the collateral was conducted in a commercially reasonable manner. At the close of the hearing, the Court took the matter under advisement.

On April 21, 2015, the Court orally ruled on the matters heard March 31, 2015, overruling the Debtors' objections to Claims 3, 5, and 6 and ruling that the claims were properly characterized as unsecured. (Tr. of Court's Oral Ruling at 12–13, Apr. 21, 2015, Doc. No. 97). Further, the Court orally ruled that Claim 4 was partially secured in the amount of $80,368.00 and unsecured for the $54,048.44 balance of the claim. (Tr. of Court's Oral Ruling at 13, Apr. 21, 2015, Doc. No. 97). Also, the Court ruled that

Farm Service Agency's ("FSA") guarantees of certain of the Bank's loans to the Debtors could not be considered collateral for the loans. (Tr. of Court's Oral Ruling at 10–12, Apr. 21, 2015, Doc. No. 97). The Court ordered that Claims 3, 4, 5, and 6 would be allowed, subject to the Debtors' right to object to the claims on the basis that the sale of the Bank's collateral was not conducted in a commercially reasonable manner. (Tr. of Court's Oral Ruling at 13, Apr. 21, 2015, Doc. No. 97).

On May 4, 2015, pursuant to their reservation of rights, the Debtors filed their third objection to the Bank's claims, arguing that the sale of the Debtors' farm equipment to satisfy the indebtedness to FSA and the Bank was not commercially reasonable in light of the fact that the Debtors were not given written notice of the sale and did not waive notice of the sale. (Debtors' Objections to Claims 3, 4, 5 & 6 at 2, Doc. No. 75). The Bank argues that the sale of the farm equipment was a voluntary liquidation by the Debtors, the Bank did not take possession of the equipment nor conduct the sale, and, therefore, notice of the sale was unnecessary.

A hearing was held on this issue on June 24, 2015, at which time the Debtors also argued that Mrs. Knight had no knowledge of and did not participate in the sale. Therefore, even if Mr. Knight were estopped from contending that the sale was not commercially reasonable because of his knowledge of the sale, the same estoppel argument could not be applied to Mrs. Knight. After a hearing on the merits on June 24, 2015, the Court took the matter under advisement.

## JURISDICTION

The Court has jurisdiction of this case under 28 U.S.C. § 1334 and § 157. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B) & (O). The following are the Court's findings of fact and conclusions of law in accordance with Federal Rules of Bankruptcy Procedure 7052 and 9014.

## FACTS

In the April 21, 2015 ruling, the Court announced a number of findings of fact and conclusions of law, all of which are incorporated herein by reference. (*See* Tr. of Court's Oral Ruling, Apr. 21, 2015, Doc. No. 97). Some of the previous findings of fact will be repeated here to provide continuity between the two rulings.

The Debtors engaged in a farming operation under the name M & E Knight Farms prior to filing their Chapter 13 case on September 26, 2014. Mr. Knight stated that he farmed for a continuous period of five years, first under his individual name and later as M & E Knight Farms. (Tr. at 60).[1] Mrs. Knight described the M & E Knight Farms operation as a "joint venture" between the spouses. (Tr. at 78). The Bank made non-consumer agricultural crop loans to the Debtors over a period of years, and FSA also provided financing to the Debtors and guaranteed three loans to the Debtors from the Bank. (Tr. at 19).

The Bank filed four claims in the Debtors' bankruptcy case. Claim 3 was filed in the amount of $53,264.74, Claim 4 was filed in the amount of $134,416.44, Claim 5 was filed in the amount of $295,981.97, and Claim 6 was filed in the amount of $35,815.39. (Ex. 9, Claims 3, 4, 5 & 6). As stated above, the Court has previously ruled that Claims 3, 5, and 6 were properly characterized as unsecured and that Claim 4 was partially secured in the amount of

---

1. References to "Tr." shall refer to the transcript from the hearing held on June 24, 2015 on the Debtors' Objection to Claims 3, 4, 5, and 6, Doc. No. 75.

$80,368.00 and unsecured for the $54,048.44 balance of the claim.

The Bank's loans to the Debtors were secured by a security interest in various types of property belonging to the Debtors, including crops and farm equipment. (Ex. 9, Claims 3, 4, 5 & 6). The promissory note and security agreement evidenced in Claim 3 named Matthew Knight as the sole borrower and bore only his signature, while the other three notes, attached to Claims 4, 5, and 6 listed M & E Knight Farms, an Arkansas General Partnership, as the borrower and bore the separate signatures of Mr. and Mrs. Knight as both "member" and "individual." (Ex. 9, Claims 3, 4, 5 & 6).

In the 2013 crop year, the Debtors suffered a difficult season in which they incurred financial losses. (Tr. of Court's Oral Ruling at 4, Apr. 21, 2015, Doc. No. 97). They notified the Bank around January 2014 that they did not intend to continue farming. (Tr. at 52).

Tim St. Clair, the former president of the Bank and the Debtors' loan officer, testified at the hearing that "Matthew came in early in the year to tell [St. Clair] that he was no longer going to farm.... At that point, [the Bank was] willing, and probably able, to keep the operation going if [Matthew] chose to do that, with some help from FSA. He was adamant about not farming." (Tr. at 39). St. Clair informed Jason Floriani, a loan officer at FSA, that "Matthew stated that their decision was final. Therefore, any restructuring scenarios or interest assistance were ruled out as a viable option." (Ex. 1, Letter from St. Clair to Floriani).

St. Clair's testimony is consistent with the testimony of Mr. Knight, who testified that around January 31, 2014, he communicated to St. Clair that he had "decided [he] wasn't going to farm anymore." (Tr. at 52). St. Clair said the Debtors voluntarily liquidated their 2013 crop and paid the proceeds to the Bank. (Tr. at 30–33). Exhibit 10 evidenced all the payments from the sale of the Debtor's 2013 crop, and Exhibit 1 reflected that of the $863,240.64 received as crop proceeds, $673,643.09 was applied to the Debtors' 2013 crop loans. (Exs. 1, 10). The last payment to the Bank from crop proceeds was applied on March 7, 2014, toward the indebtedness on the loan evidenced by Claim 5. (Exs. 1, 9). However, the Debtors' obligations under the various loan agreements were not completely satisfied by the crop proceeds. Exhibit 1 reflected that the Debtors still owed balances on the four loans and failed to make payments due on March 15, 2014 (Claims 5 and 6), April 1, 2014 (Claim 4), and May 1, 2014 (Claim 3). (Exs. 1, 9).

The indebtedness to the Bank was also secured by liens on the Debtors' farm equipment that were subordinate in priority to the liens of FSA, except for certain equipment in which the Bank claimed a purchase money security interest. (Tr. at 20; Ex. 1, Letter to Floriani at 2). St. Clair testified that when Mr. Knight informed the Bank he was discontinuing his farm operation, the Bank "allowed him to liquidate his equipment. [The Bank] never foreclosed or never took an adversarial position. Matthew was always cooperative and.... That was the easiest ... thing to do." (Tr. at 39).

St. Clair further testified that if a farmer is in default on his loan, the Bank's procedure is to give notice of default and refer the matter to its attorney, but the Bank does not follow that procedure if the liquidation is voluntary. (Tr. at 13, 42). In this case, neither St. Clair nor Derick Reynolds, a current Bank employee who also testified, were aware of any notice of default ever being sent to the Debtors. (Tr. at 42, 49). Mr. Knight testified that, although he received a couple of state-

ments from the Bank about payments coming due, the Bank never sent him a notice of default or anything else that could be considered "threatening," and he did not consult an attorney during the period leading up to the sale of his equipment. (Tr. at 54–55). He said the Bank has not pursued collection or taken any other legal action against him since the sale took place. (Tr. at 55).

St. Clair stated that on April 30, 2014, he and Floriani visited a location near the Debtors' farm where the Debtors had assembled the equipment subject to the liens of FSA and the Bank. (Tr. at 26, 29). St. Clair said Mr. Knight's brother Jeremy met them at the location. (Tr. at 29). A document titled "Notes" dated April 30, 2014, and included in Exhibit 7 memorializes the occasion: "An inventory of M & E equipment was completed by Tim St. Clair of the Bank of McCrory and Jason Floriani with FSA. All equipment was present and in good condition. The process of scheduling a sale will begin." (Ex. 7, "Notes"). Also part of Exhibit 7 is an FSA "Appraisal of Chattel Property" prepared in 2014. (Tr. at 28; Ex. 7, "Appraisal of Chattel Prop."). The equipment was appraised at $360,600.00 in total. (Ex. 7, "Appraisal of Chattel Prop."). Exhibit 7 also contains an earlier appraisal of the Debtors' equipment dated February 14, 2013, prepared by Chris Eldridge of Eldridge Supply Company. The total value of the equipment is listed at $490,500.00 and the appraisal appears to list fewer pieces of equipment than the 2014 appraisal. (Ex. 7, "Equip. Appraisal," Feb. 14, 2013).

As to who actually initiated the plans for the sale of the equipment, Mr. Knight's recollection was that he "got word through [his] brother that they wanted to have a sale." (Tr. at 53). At that point, Mr. Knight said he decided upon the auction

company. (Tr. at 53). Mr. Knight testified that he "called Jason [Floriani] at the FSA office and told him that [he] had contacted a few auctioneers and Leonard Devazier was the one . . . who could do it the earliest. And that's who [he] chose to do it." (Tr. at 53). When asked if he made the initial contact with Leonard Devazier ("**Devazier**") about selling his equipment, Mr. Knight replied, "Correct. . . . He was just the first one that could do the sale, and that's . . . the reason why he got it." (Tr. at 61).

Mr. Devazier testified at the hearing, and his recollection of the initial contact differed from that of Mr. Knight. Devazier stated that he "was notified of the auction by FHA [sic] . . . and then [he] talked to . . . Mr. Knight." (Tr. at 102). No representative of FSA testified at the June 24 hearing.

St. Clair agreed with Mr. Knight's testimony that Mr. Knight "set the sale up." (Tr. at 41). St. Clair said that "this sale was not set up by the Bank of McCrory." (Tr. at 41). He further testified that "at some point, [he was] . . . contacted by Devazier about the equipment that was to be sold, but . . . [the Bank] didn't contact [Devazier] and say, 'Hey, will you sell this for us' or anything." (Tr. at 41). Furthermore, St. Clair said he did not remember ever signing a contract with Devazier or giving written permission to the Debtors to contact Devazier. (Tr. at 40–41).

Devazier said his discussions with Mr. Knight were related to choosing the date of the auction, arranging transport of the equipment to the sale, and acquiring the "payoffs" on the equipment. (Tr. at 102). He said that he and Mr. Knight together determined the date of the auction based on when Mr. Knight "knew he was through with the equipment and [would] have time to get it in to [Devazier]." (Tr. at 102). The sale date was eventually set

for June 19, 2014, at an auction site on Highway One in Forrest City, Arkansas. (Ex. 2 at 7; Tr. at 82, 103).

Devazier testified that his practice is to rely on the lender and the FSA office to supply him with information regarding farm equipment he is selling at auction. (Tr. at 87). Mr. Knight said that Devazier "got all the numbers for the Bank of McCrory and the FSA, and he took it on from there." (Tr. at 53). St. Clair agreed that he provided equipment lists to the sale auctioneer in advance of the sale but that he rarely communicated with the Debtors from March through June 2014. (Tr. at 34–35, 38–39).

At some point prior to the sale, Devazier traveled to the Debtors' farm to view the equipment, and afterwards, he "sent people back, that haul equipment for [him]." (Tr. at 85). Devazier said those present at the equipment site on this occasion were Devazier, his son, another gentleman who often travels with Devazier, and possibly Mr. Knight's brother Jeremy. (Tr. at 86). Mr. Knight recalled meeting with Devazier prior to the sale to show him the equipment. (Tr. at 53). Devazier described the equipment as "rough to average. Nothing excellent." (Tr. at 91).

Both Devazier and Mr. Knight stated that the two exchanged frequent phone calls during the period prior to the sale regarding arrangements for the auction. (Tr. at 58–59, 100). The Bank introduced a copy of Mr. Knight's cell phone invoices of monthly charges detailing calls made from mid-April to June 12, 2014, the last date for which charges were assessed on the invoice. The invoices reflected twelve calls between Devazier's office or cell phone and Mr. Knight's cell phone originated by Mr. Knight in May and June. (Ex. 11). During the same months, five calls between the two originated from De-

vazier's telephone. (Ex. 11). The lengthiest call, eleven minutes, took place on June 12, 2014, a week before the auction date. (Ex. 11). Later that day, a second, brief call occurred between Devazier and Mr. Knight. (Ex. 11).

The Bank did not transport any of the equipment to the auction site in Forrest City. (Tr. at 38). When asked how the equipment was transported to the sale, Mr. Knight. said that Devazier and his crew moved it and that neither he nor his brother Jeremy delivered any equipment to the auction site. (Tr. at 61). However, Devazier testified his employees hauled some of the equipment but that Mr. Knight's "people" also delivered a portion of the equipment. "Maybe his brother or someone, but they drove some of the stuff in to the sale," Devazier testified. (Tr. at 94–95).

Mr. Knight stated that he never signed a contract with Devazier nor gave written authorization to the lender to sell the equipment. (Tr. at 54). Devazier testified that he did not have a written contract with the Debtor, the Bank, or FSA. (Tr. at 87).

Devazier testified that the Bank does not typically instruct the auctioneer on how to conduct the sale and did not do so in this case. (Tr. at 103–04). Devazier further testified that the Debtors' equipment with FSA–Bank liens was sold without reserve, as is customary with equipment encumbered by such liens. (Tr. at 101–02). He also stated that at the same auction, he sold some of the Debtors' equipment encumbered by liens of Case Credit with reserve. (Tr. at 92–93).

The auction resulted in net proceeds of $105,635.00 from the sale of the equipment securing the liens of FSA and the Bank. (Ex. 1, "Consignor Settlement"). A check representing the amount of net proceeds [2]

---

2. Devazier testified that the Debtors were    paid approximately $700.00 for one fuel tank

was written jointly to the Bank and FSA, which the Bank turned over to FSA. (Tr. at 108). The Debtors' remaining indebtedness to the Bank resulted in the Bank's filing of four unsecured claims in the Debtors' bankruptcy case totaling $519,478.54. (Ex. 9, Claims 3, 4, 5 & 6). The Court found in its April 21, 2015 ruling that since the auction, the Bank has claimed a first lien in $80,368.00 of the sale proceeds that the Bank sent to FSA by mistake. (Tr. of Court's Oral Ruling at 7, Apr. 21, 2015, Doc. No. 97). However, FSA had not paid these proceeds to the Bank as of the hearing date.

Introduced into evidence were two documents named "Consignment Order" and "Consignor Settlement," each dated June 3, 2015, almost a year after the June 19, 2014 sale date. (Ex. 2 at 1–4). The Consignment Order contained a list of twenty-five pieces of equipment to be sold by Devazier and showed the consignors to be Matthew Knight, M & E Farms, FSA, and Bank of McCrory. (Ex. 2 at 1–2). The same consignors were listed on the Consignor Settlement, which showed the sale price for each item, the expenses, and a total of $105,635.00 in net sale proceeds to be paid to the consignors. (Ex. 2 at 3–4). When asked why there were four named consignors on the two documents, Devazier testified, "[T]hat's the name that the equipment was sold under." (Tr. at.87). After the sale, Devazier issued a check for the proceeds, less costs of the auction, to the Bank and FSA together. (Tr. at 99). As stated, FSA ultimately received approximately all the net sale proceeds. (Tr. at 108).

Despite the Bank's description as a consignor in the Exhibit 2 documents, St. Clair stated he did not sign any documents consigning the equipment. (Tr. at 35). Another copy of the Consignor Settlement was offered into evidence as part of Exhibit 1. It is identical to the Consignor Settlement in Exhibit 2 except that the document is dated July 1, 2014, bears handwritten numbers adjacent to each item, and lists the consignors as Matthew Knight, M & E Farms, and FSA, but not the Bank of McCrory. (Ex. 1, "Consignor Settlement").

When explaining another Consignment Order generated by the June 19, 2014, sale for different equipment with consignors listed as CNH Capital and Matthew Knight, Devazier stated that CNH was listed as a consignor of that equipment because Mr. Knight "owed [CNH Capital] for the equipment." (Tr. at 91–92; Ex. 2 at 5–6).

Devazier testified that Mr. Knight did not attend the sale but Floriani and St. Clair were present. (Tr. at 99–100). Devazier stated that he "probably" told Mr. Knight the date and time of the sale but provided no written information to him. (Tr. at 103). St. Clair testified that "it was Mr. Knight's decision to quit farming and to have the sale. As far as any notice being given to Mr. Knight that the sale was taking place, with him being the one actually setting the sale up … that was not given by the bank." (Tr. at 12–13).

Mr. Knight admitted he was aware of where the sale would take place but did not know the specific time because equipment belonging to other farmers was also going to be auctioned at the sale. (Tr. at 54). He never received any letter captioned "Notice of Sale," signed a document authorizing the Bank to sell his equipment,

and one push blade from the sale, which amount was made payable to Mrs. Knight. (Tr. at 104). It is unclear from the record whether the $700.00 was deducted from the $105,635.00 in net sales proceeds that was ultimately paid to FSA.

nor waived his right to notice. (Tr. at 54–56).

Mr. Knight testified that he had no complaints about how the sale was conducted, but also that if he had known he was going to incur a half million dollar deficiency after the sale, he would have set some reserves on the equipment. (Tr. at 71). Reviewing the sale price of each piece of equipment, Mr. Knight stated, "there's a few things [that] possibly could have [sold for a higher price] but it's an auction . . . you never [know]." (Tr. at 72). In subsequent testimony, when asked by his attorney to evaluate the sale price of specific pieces of equipment, Mr. Knight testified each piece sold for what it was worth. (Tr. at 72). His attorney asked, "If this equipment would have been sold some other way, besides auction, if you would have advertised it or let all your farmer buddies know that this equipment is for sale, could you have gotten a higher price?" (Tr. at 72–73). Mr. Knight answered, "I don't think so." (Tr. at 73).

Mrs. Knight also testified at the hearing, stating that she was "pretty much a signature on paper to get a loan" and never had contact with the Bank. (Tr. at 75). Counsel for the Debtors conceded Mrs. Knight was obligated on all the notes to the Bank except the first note, which was evidenced by Claim 3. (Tr. at 116, 118; Ex. 9, Claim 3, Promissory Note).

When questioned about the equipment sale, Mrs. Knight testified that she was unaware the auction was going to take place. (Tr. at 75). Mrs. Knight stated she did not personally speak to anyone at the Bank about the sale, nor did she receive notice of default or a notice of sale, and she was not afforded an opportunity to waive such notice. (Tr. at 77). Further, she did not sign any document giving the Bank, Devazier, or her husband permission to conduct the auction. (Tr. at 76).

## DISCUSSION

The Debtors argue that the Bank's disposition of its collateral was not commercially reasonable because the Bank did not give the Debtors written notice of the auction nor was there a waiver of notice by the Debtors. Therefore, relying on Arkansas law, the Debtors contend that the Bank is not entitled to a deficiency claim.

The applicable statute provides, "[a]fter default, a secured party may sell, lease, license, or otherwise dispose of any or all of the collateral. . . . Every aspect of a disposition of collateral . . . must be commercially reasonable." ARK. CODE ANN. § 4–9–610(a)–(b) (2001). A secured party that disposes of property in this manner "shall" send the debtor and others "a reasonable authenticated notification of disposition." ARK. CODE ANN. § 4–9–611(b) (2001).

The Bank concedes it did not give written notice of the sale to the Debtors but denies that the Debtors were entitled to notice because the Debtors voluntarily liquidated the Bank's collateral. The Bank argues that the Debtors, and not the Bank, were responsible for the sale; therefore, the question of whether the Bank conducted a commercially reasonable sale is of no great import. The Bank also contends that as second lienholder of the property, it had no statutory duty to give the Debtors notice, citing *Primus Financial Services v. Seitz*, 102 Ark. App. 146, 283 S.W.3d 235 (2008) (holding that lienholder that had not possessed nor disposed of collateral was not required to give notice of a sale conducted by third party towing company that held a first-priority possessory lien on the collateral).

Addressing the Bank's arguments first, the Court finds for the reasons stated below that Mr. Knight voluntarily sold the

collateral, planning and taking responsibility for the consummation of the sale.

## A. *Voluntary Sale of Collateral*

First, it is undisputed that Mr. Knight voluntarily contacted the Bank around January 2014 and informed St. Clair, his loan officer, that M & E Knight Farms was discontinuing farming operations. The Bank did not withdraw its financial support of the Debtors' operation nor force them to cease farming; Mr. Knight freely chose to discontinue the operation in the face of farm losses and mounting debt. At that time, M & E Farms and Mr. Knight were apparently not in default on payments on the four loans, each of which were due later that Spring. (Exs.1, 9). Consistent with there being no default, the Bank had not served any notice of default prior to the Debtors' decision to cease farming, and, according to the testimony of the Bank's witnesses and Mr. Knight, the Debtors have never subsequently received notice of default. Mr. Knight was nevertheless adamant about his decision to cease farming operations, even though the Bank was willing to continue to work with him. When Mr. Knight discontinued his farming operation, he set the process in motion that ultimately culminated in the sale of his crops and equipment.

Second, after his conference with St. Clair, Mr. Knight proceeded to market and sell the remainder of his 2013 crop without Bank intervention or oversight, as is the Bank's typical course of dealing with its agricultural borrowers. Mr. Knight then voluntarily turned over most of the proceeds to the Bank, presumably under their original agreement or their course of dealing. The Debtors do not argue that the sale of the crops was not made in a commercially reasonable manner. When asked why the Debtors did not contest the commercial reasonableness of the crop sale without notice, the Debtors' counsel argued the crops were perishable goods, and, thus, the Bank was exempt from providing the Debtors notice under Section 4–9–611(d) of the Arkansas Code. (Tr. at 116). That provision exempts the secured party from providing notice of disposition "if the collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market." ARK. CODE ANN. § 4–9–611(d) (2001).

The Debtors' reliance on this provision is misplaced. While it is true the crops would likely be considered perishable goods under the statute, the Debtors overlook the undisputed fact that it was Mr. Knight, the "debtor" under the statute, who sold the crop, not the Bank, which is the "secured party." There is no evidence that the Bank took any action to dispose of the crops under its security interest. Its passive role was to accept payment as the crops were sold by Mr. Knight. His sale of the crop after his announcement that he was suspending his farming operation supports the Bank's contention that Mr. Knight voluntarily liquidated all collateral.

Third, the Bank never resorted to engaging an attorney to pursue payment through legal process. The last payment from crop proceeds was applied to the Debtors' indebtedness on March 7, 2014, leaving a substantial balance owed to the Bank. (Ex. 1). At that time, if not before, it must have become evident to the Bank and the Debtors that no more farm income would be earned, and the farm equipment would have to be sold in order to reduce or eliminate the Debtors' obligations. However, the Bank did not issue a notice of default, nor did it refer the account to an attorney for collection or other legal action after the Debtors failed to make payments on the loans when due. Similarly, Mr. Knight did not consult an attorney at any time prior to the sale on June 19, 2014.

Mr. Knight and the Bank were not adversarial and were clearly cooperating throughout the Spring of 2014.

Fourth, the Bank neither repossessed nor disposed of the equipment nor did it exercise actual or constructive possession over the property in the manner defined by the four security agreements. Those agreements define actual possession as "physical, immediate and exclusive control ... affirmatively accepted [by the Bank]." (Ex. 9, Claim 3 at 6 of 8, Claim 4 at 7 of 9, Claim 5 at 8 of 9, Claim 6 at 8 of 9). Constructive possession means having "both the power and the intent to exercise control over the Property." (Ex. 9, Claim 3 at 6 of 8, Claim 4 at 7 of 9, Claim 5 at 8 of 9, Claim 6 at 8 of 9). From the testimony of all the witnesses, including Devazier, the Court finds that Mr. Knight maintained sole control of the property, both actual and constructive, until it was transported to the sale and transferred into the physical control of Devazier.

Fifth, Mr. Knight voluntarily assembled the equipment at a location where it was inventoried and appraised by St. Clair and Floriani on April 30, 2014. After learning from his brother that the Bank and FSA were agreeable to a sale, Mr. Knight began interviewing auctioneers. The telephone invoices show the earliest phone call between Devazier and Mr. Knight occurred on May 2, 2014. (Ex. 11). There was no evidence that Mr. Knight was ordered or instructed to pursue the sale of the collateral by anyone at the Bank or FSA.

Sixth, Mr. Knight, himself, chose the auctioneer and the earliest available auction date. Mr. Knight made it clear that he was the person who interviewed several auctioneers, decided on Devazier based on early availability, and then telephoned Floriani to inform him of the choice. St. Clair concurred with Mr. Knight's recollection, asserting that the Bank did not give written permission to the Debtors to contact Devazier but did supply equipment lists to Devazier after he was selected. Devazier agreed with Mr. Knight that once he was chosen auctioneer, he and Mr. Knight together selected the specific date of the auction, but, contrary to Mr. Knight's testimony, Devazier stated that it was Floriani who first contacted him about the auction. The Court accepts Mr. Knight's testimony as the more credible account because it is more factually specific and because Mr. Knight was so certain of the chain of events. Furthermore, there is no evidence that the Bank had any input in the choice of auctioneer or sale date.

Seventh, Mr. Knight and Devazier spoke by telephone at least seventeen times between May 2, 2014, and June 12, 2014. The frequency of contact just weeks before the sale supports the inference that Mr. Knight was deeply involved in and was supervising the various aspects of planning and consummating the sale.

Eighth, the fact that Mr. Knight did not sign a contract with Devazier is of no import because Devazier explained he does not enter into written contracts with his consignors. Similarly, Devazier's documents listing Mr. Knight, M & E Farms, FSA, and the Bank as consignors are not indicative of the Bank's status as a consignor because it was Devazier's practice to list both the owner and the lienholder as consignors. (Tr. at 91–92; Ex. 2). Furthermore, the earlier Consignor Settlement omits the Bank as a consignor, rendering the later Consignor Settlement not particularly probative of the Bank's role in the sale. (Exs.1, 2).

Ninth, under the Article 9 statute regarding payment of proceeds following a sale, the Bank was not treated as the secured party under whose security inter-

est the disposition was made. Assuming without deciding that the sale was an Article 9 disposition of collateral, the Court acknowledges that Section 4–9–615 governs how the proceeds of an Article 9 disposition are applied. First, expenses of disposition and attorney's fees are paid, followed by the payment of obligations secured by the security interest *under which the disposition is made,* and then payment of subordinate security interests. ARK. CODE ANN. § 4–9–615(a)(1)–(3) (2001) (emphasis added). Under this provision, even if the auction were an Article 9 disposition as the Debtors argue, the proceeds were paid first to expenses and then a check was written *jointly* to the Bank and FSA. If the auction had been an Article 9 disposition by the Bank, the check would have been made payable to the Bank only.

In accord with this point is a case cited by the Bank in which a lender holding a security interest in a vehicle brought an action against the owner for the amount remaining under the financing agreement after the car was wrecked in an accident. *Primus Fin. Servs. v. Seitz,* 102 Ark. App. 146, 146–47, 283 S.W.3d 235, 236 (2008). The vehicle was sold by a towing company pursuant to an Arkansas statute other than Article 9 that gave the towing company a first-priority possessory lien. *Id.* The trial court dismissed the lender's action on the basis that the lender failed to send notice of the sale and that fact barred a deficiency. *Id.* The Court of Appeals reversed the trial court, ruling that the lender had no duty under Article 9 to notify the vehicle owner that the towing company intended to foreclose on its lien; disposition was by the towing company, not the lender. *Id.*

Considering the foregoing facts and circumstances, the Court finds that the Bank has proved by a preponderance of the evidence that Mr. Knight voluntarily liqui-dated the Bank's collateral, a finding that prompts the question of whether Article 9 requirements of commercial reasonableness apply when the debtor plans and directs the sale.

## B. *Applicability of Article 9 to a Voluntary Sale*

In two Arkansas cases with facts similar to the facts in the instant case, the Arkansas Supreme Court and Arkansas Court of Appeals have held that the Article 9 requirements of commercial reasonableness are immaterial to a voluntary liquidation.

In the earlier of the two cases, the Arkansas Supreme Court reversed the trial court ruling and held that the borrower either agreed to or actually conducted the sale of the lender's collateral, rendering immaterial any question of notice of the sale and commercial reasonableness under Article 9. *Pine Bluff Prod. Credit Ass'n. v. Lloyd,* 252 Ark. 682, 480 S.W.2d 578 (1972). The borrowers operated a chicken hatchery and hen houses for commercial production of eggs. *Id.* at 683, 480 S.W.2d at 579. Various circumstances unrelated to the relationship between the borrowers and the lender forced the borrower to stop feeding the hens. *Id.* at ·686–87, 480 S.W.2d at 580–81. After the borrower conferred with the lender, the decision was made to sell the hens, which were part of the lender's collateral, and the lender then sent prospective buyers to the borrower. *Id.* at 687, 480 S.W.2d at 581. Eventually the borrower sold the hens after negotiating with one of the prospective buyers. *Id.* at 691, 480 S.W.2d at 583. A year later the lender instituted an action on the loans to the borrower and a foreclosure of the liens in real and personal property. *Id.* at 687, 480 S.W.2d at 581. The trial court awarded the lender a deficiency judgment for the remaining debt owed by the borrowers, but also awarded the borrowers

damages in a greater amount that resulted from losses partially incurred by the sale of the collateral. *Id.* at 684–85, 480 S.W.2d at 579–80.

Implied in the ruling is that the trial court decided the case, in part, based on lack of notice of sale and commercial reasonableness under Article 9. The Supreme Court reversed the trial court, holding that "notice of the sale and commercial reasonableness of the sale under Ark. Stat. Ann. Sections 85–1–201 and 85–9–504(3) become immaterial as [the borrower] either agreed to or made the sale." *Id.* at 693, 480 S.W.2d at 584. This portion of the opinion concludes that the rules regarding notice and commercial reasonableness do not apply where the debtor, not the secured party, is the seller of the collateral. *Contra Walker v. Grant Cnty. Savs. & Loan Ass'n,* 304 Ark. 571, 576, 803 S.W.2d 913, 916 (1991) (where secured party cited *Lloyd* in arguing Article 9 notices were immaterial when the debtor agreed to or made the sale, court distinguished *Lloyd* as a case dealing with perishable collateral where notice requirements were excepted). *But see id.* at 582, 803 S.W.2d at 919 (Dudley, Hays and Glaze, JJ., dissenting) (observing that Lloyd court's reversal relied not on perishable nature of the collateral but on equitable estoppel when facts showed that Lloyd was the real seller).

The second apposite case is based on facts proving the borrower's agent sold the collateral; therefore, the lender was entitled to a deficiency judgment despite lack of notice of sale or other proof of commercial reasonableness. *Davis v. Ark. Bank,* No. CA 91–409, 1992 WL 93266 (Ark.Ct. App. Apr. 22, 1992). The Davises borrowed money from Arkansas Bank and then assigned a security interest in a vehicle to the bank as collateral. *Id.* at *1. When the Davises could not make payments on the loan, they agreed with the bank to sell the car to pay off their loan. *Id.* They delivered the vehicle to a used car dealer who attempted to sell the car without success and eventually purchased it himself, paying the purchase price to the bank. *Id.* The bank then sued the Davises for the balance owed. *Id.* The Davises argued that the bank had not given them written notice of sale nor sold the car in a commercially reasonable manner and was, therefore, not entitled to a deficiency. *Id.*

The Arkansas Court of Appeals identified numerous facts proving that the bank did not sell the vehicle. The car was never repossessed by the bank and was never in the bank's possession. *Id.* The Davises decided a used car dealer would sell the car and chose to deliver the car to him. *Id.* at *2. The bank did not advise the car dealer where or how to sell the car. *Id.* The car dealer felt he had the Davises' permission to sell the car at whatever price he could procure. *Id.* Considering these facts, the Arkansas Court of Appeals stated that the Davises' reliance on the Uniform Commercial Code was "misplaced in this instance ... because the vehicle was not disposed of by [the bank], the secured party.... Section 9–504 of the Uniform Commercial Code applies to the disposition of collateral by a secured party, and the issues of notice of sale or reasonableness of a sale under the Uniform Commercial Code are immaterial when the sale is made by the debtor or the debtor's agent." *Id.* at *1 (citing *Pine Bluff Prod. Credit Ass'n v. Lloyd,* 252 Ark. 682, 480 S.W.2d 578 (1972); *Becknell v. Quinn,* 592 F.Supp. 102 (E.D.Ark.1983), *aff'd per curiam sub nom. Becknell v. First Nat'l Bank in Little Rock,* 740 F.2d 609 (8th Cir.1984)).

Although the *Davis* case is unpublished and lacks precedential value to state trial courts, it nevertheless is persuasive to this Court because, like *Lloyd*, the facts are

similar to the instant case. All three sales were accomplished by either the UCC debtor or the debtor's agent. The Court concludes that in such cases, the Article 9 rules requiring the secured party to give notice of disposition of collateral are not applicable because the secured party is not the person in charge of the disposition.[3]

## C. *Absolute Bar Rule*

The finding that the Bank did not dispose of the collateral renders inapplicable any issue concerning lack of commercial reasonableness that would prevent the Bank from recovering the balance owed on the equipment. However, even if the Court had decided that the Bank was required to send notice of sale as required by Article 9, a change in the law regarding non-consumer cases calls into question the application of the "no notice-no deficiency" or absolute bar rule relied on by the Debtors as grounds for their objections to claims.

To support their position, the Debtors cite Arkansas Supreme Court precedent holding that a secured party's failure to give written notice of a disposition of the debtor's property or otherwise establish the commercial reasonableness of the sale by a written agreement with the debtor will bar the secured party from any right to a deficiency. *Walker*, 304 Ark. at 578–79, 803 S.W.2d at 917 (citing *Bank of Dover v. Shipley*, 299 Ark. 451, 773 S.W.2d 825 (1989) & quoting *First State Bank of*

*Morrilton v. Hallett*, 291 Ark. 37, 41, 722 S.W.2d 555, 557 (1987)).

In a 1995 case involving the law of secured transactions, the Eighth Circuit Court of Appeals traced the judicial evolution of the absolute bar rule in Arkansas and noted the uncertainty that has surrounded its application. *City Nat'l Bank of Fort Smith v. Unique Structures, Inc.*, 49 F.3d 1330, 1333 n. 3 (8th Cir.1995). The Eighth Circuit stated that "[p]rior to 1987, the Arkansas courts presumed that a creditor who failed to dispose of collateral in a commercially reasonable manner was not entitled to a deficiency judgment, but allowed the creditor to rebut this presumption with evidence that a true deficiency existed." *Id.* (citing *Norton v. Nat'l Bank of Commerce*, 240 Ark. 143, 149–50, 398 S.W.2d 538, 542 (1966)). However, as the Eighth Circuit observed, the Arkansas Supreme Court subsequently adopted the absolute bar rule and later confirmed that the rule applies not only to notice defects, but generally to any defect in a disposition of collateral after default. *Id.* (citing *Hallett*, 291 Ark. at 40–42, 722 S.W.2d at 556–57; *Bank of Bearden v. Simpson*, 305 Ark. 326, 329–30, 808 S.W.2d 341, 343 (1991)).

On July 1, 2001, with the judicially created absolute bar rule then in effect, the Arkansas legislature revised former Chapter Nine of the Uniform Commercial Code as adopted in Arkansas and enacted Act 1439 of 2001. 2001 Ark. Acts 1439 § 1. The 2001 law significantly revised the existing law on Secured Transactions, includ-

---

**3.** The Debtors here also argue that there is no evidence Mrs. Knight participated as a seller of the collateral, and, therefore, she is not estopped from asserting a violation of the notice provision in Section 4–9–611 of the Arkansas Code. However, the Court's holding is not based on elements of equitable estoppel, but upon the wording of the applicable Article 9 provisions. The statute specifically states that "a secured party that disposes of collateral under § 4–9–610 shall send to [the debtor] a reasonable authenticated notification of disposition." ARK. CODE ANN. § 4–9611(b) (2001). Because the Court has concluded that Mr. Knight voluntarily liquidated the collateral and the Bank did not dispose of the collateral, Mrs. Knight, like Mr. Knight, was not entitled to receive notice from the Bank that the collateral would be sold.

ing adding Part 6, which reorganized and expanded the previous Part 5 provisions related to default. Of particular importance to the instant case is Arkansas Code Annotated Section 4-9-626, a new provision dealing exclusively with non-consumer transactions[4] in which a deficiency or surplus is in issue and delegating to the secured party the burden to prove compliance with Part 6, which includes notice requirements. ARK. CODE ANN. § 4-9-626(a)(1)–(2) (2001).

The new provision dictates that if the secured party fails to prove compliance with Part 6, the debtor's liability for a deficiency is "limited to an amount by which the sum of the secured obligation, expenses, and attorney's fees exceeds the greater of: (A) the proceeds of the ... disposition ... or (B) the amount of proceeds that would have been realized" had the secured party complied. ARK. CODE ANN. § 4-9-626(a)(3)(A)–(B) (2001). The section then establishes that the amount of proceeds that "would have been realized" is equal to the sum of the debt unless the secured party proves that the amount is less than that sum. ARK. CODE ANN. § 4-9626(a)(4) (2001).

Thus, the new provision establishes a presumption that the total debt and the amount that would have been realized in a complying disposition are the same, result-ing in no deficiency, unless the secured party can rebut the presumption. 4 JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 34-14 at 503 (6th ed.2010) (stating that with regard to denial of deficiencies, revised Article 9 adopts the rebuttable presumption rule for business transactions through Section 9-626(a)(4)). One court explained that "[i]f [the secured party] cannot prove that it complied with Article 9 in disposing of the [collateral], then its deficiency damages are presumptively zero, unless [the secured party] proves that, had it complied with Article 9, its proceeds from reselling the [collateral] would have been less than the ... outstanding obligation." *Gen. Elec. Capital Corp. v. FPL Serv. Corp.*, 995 F.Supp.2d 935, 938 (N.D.Iowa 2014). The purpose of this provision is "to replace the judicially created, 'no-notice-no-deficiency,' rule with a new series of presumptions and burdens of proof regarding a deficiency claim." *Vantage Invs., Inc. v. Loc Nguyen Corp. (In re Vantage Invs., Inc.)*, 385 B.R. 670, 680 (Bankr.W.D.Mo.2008) (citing Mo. REV. STAT. § 400.9-626).

Research has uncovered no Arkansas Appellate or Supreme Court precedent construing Section 4-9-626 since its enactment in 2001.[5] However, Section 4-9-626 appears to be compatible with the line of pre–1987 Arkansas cases that allowed the

---

**4.** Some jurisdictions, but not Arkansas, have extended this provision to consumer cases as well. *See* OHIO REV. CODE ANN. § 1309.626 (2001).

**5.** Two recent Arkansas cases have considered the issue of a secured party's right to a deficiency. In one of these, the disposition of collateral occurred March 12, 2001, before revised Article 9 became effective. *McDonald Mobile Homes, Inc. v. BankAmerica Hous. Servs.*, 93 Ark. App. 256, 266, 218 S.W.3d 376, 384 (2005). In the second case, the parties entered into their contract prior to the Article 9 revision while the disposition of the collateral took place after the new law was effective. *Greenlee v. Mazda Am. Credit*, 92 Ark. App. 400, 402 n. 2, 214 S.W.3d 290, 292 n. 2 (2005). In *Greenlee*, the court ruled that the creditor was barred from obtaining a deficiency because the creditor failed to prove a commercially reasonable sale had occurred. *Id.* at 405, 214 S.W.3d at 293–94. In applying the repealed version of Article 9, the court commented that the applicable old and new Article 9 provisions were substantially the same. *Id.* at 402 n. 2, 214 S.W.3d at 292 n. 2. Because this dispute stemmed from a consumer transaction, Section 4-9-626 would not have applied to the facts even if the court of appeals had decided that revised Article 9 was the controlling statute.

secured party to rebut the presumption and to prove that a true deficiency existed. *See, e.g., Universal C.I.T. Credit Co. v. Rone*, 248 Ark. 665, 669, 453 S.W.2d 37, 39 (1970) (asserting that in an action to recover a deficiency, presumption arises that collateral was worth the amount of the debt and secured party has the burden of proving the amount that should have been obtained through a sale conducted according to law (citing *Barker v. Horn*, 245 Ark. 315, 432 S.W.2d 21 (1968))), *abrogated by Hallett*, 291 Ark. at 39–40, 722 S.W.2d at 556; *see also Norton*, 240 Ark. at 150, 398 S.W.2d at 542 (presuming collateral was worth at least amount of the debt and shifting to creditor burden to prove amount that would have been obtained through a sale conducted under law), *abrogated by Hallett*, 291 Ark. at 39–40, 722 S.W.2d at 556. However, those pre–1987 cases applied the rebuttable presumption without distinguishing between consumer and non-consumer transactions as the statute now requires.

Although Arkansas courts have yet to apply Section 9–626, the identical provision has been construed by courts in other state and federal jurisdictions to permit the secured party to rebut a presumption of no deficiency when a sale of collateral was deemed commercially unreasonable. *See, e.g., Bank of Am. v. Sea–Ya Enters., LLC*, 79 U.C.C. Rep. Serv. (West) 504 (D.Del.2013) (applying rebuttable presumption in California Commercial Code § 9626 instead of previous absolute bar rule (citing *In re Wilmington Hospitality LLC*, 320 B.R. 73, 77 (Bankr.E.D.Pa.2005) (interpreting New Jersey's version of the same UCC provision))); *In re MarMc Transp., Inc.*, 469 B.R. 84, 92 (Bankr. D.Wyo.2012) (applying Wyoming Statute § 34.1–9–626 in holding that secured party failed to rebut presumption of no deficiency); *C & J Leasing Corp. v. Beasley Invs., Inc.*, No. 08–0074, 2009 WL 777870, at *5 (Iowa Ct.App. Mar. 26, 2009) (un-

published table decision) (applying revised Article 9 rebuttable presumption rule provided by Iowa Code § 554.9626 and rejecting debtor's assertion that absolute bar rule remains good law in Iowa). While not binding precedent, these decisions are persuasive that the rebuttable presumption has displaced the absolute bar rule in *non-consumer* cases governed by a revision of Article 9 that includes Section 9–626. Because the basis for this Court's decision is that Mr. Knight voluntarily liquidated the collateral making the Article 9 notice requirements inapplicable to this case, the Court will leave for another day the construction of revised Section 4–9–626.

## CONCLUSION

In summary, Mr. Knight, the UCC debtor, was the seller of the equipment. The Bank as the secured party possessed nothing and disposed of nothing. That being the case, Article 9 issues of notice and commercial reasonableness are not relevant to a determination of this dispute.

For the foregoing reasons, the Debtors' objections to Claims 3, 4, 5, and 6 filed by Bank of McCrory are overruled. Mr. and Mrs. Knight are obligated on Claims 4, 5, and 6, and Mr. Knight is solely obligated on Claim 3. The Bank of McCrory's claims are allowed in the amounts determined by the Court's April 21, 2015 oral ruling as follows: Claim 3 is allowed in the amount of $53,264.74 as unsecured; Claim 4 is allowed in the amount of $80,368.00 as secured, and the remaining balance of $54,048.44 is allowed as unsecured; Claim 5 is allowed in the amount of $295,981.97 as unsecured; and Claim 6 is allowed in the amount of $35,815.39 as unsecured.

IT IS SO ORDERED.