Edward WALKER and Ortha Walker *v.* GRANT COUNTY SAVINGS AND LOAN ASSOCIATION

90-124                                              803 S.W.2d 913

Supreme Court of Arkansas
Opinion delivered February 18, 1991.

*David J. Manley*, for appellant.

*David E. Smith*, for appellee.

ROBERT L. BROWN, Justice. This appeal concerns the notice procedures a lender must follow under the Uniform Commercial Code in order to claim a deficiency judgment against the debtor following the sale of collateral. The facts in this case are not disputed.

On May 24, 1985, appellants Edward Walker and his wife,

Ortha Walker, signed a promissory note in favor of appellee Grant County Savings and Loan Association in the amount of $59,134.39, which was secured by thirty head of cattle and various pieces of logging equipment including a John Deere skidder, two Ford trucks, a Prentice loader, a Massey Ferguson tractor, and an International tractor. the back of the note contained the terms of the security agreement which included notice to the Walkers in the event of default and sale of collateral:

> I also agree that if any notice is required to be given to me of your intended sale or disposition of the property, notice will be considered commercially reasonable if provided by first class mail addressed to me at the address listed on the front side of this form *mailed 10 days before the date of intended disposition.* [Emphasis ours.]

The Walkers subsequently defaulted on their note payments, and the savings and loan commenced the process for repossessing the equipment and selling the same. On September 8, 1988, the Walkers and representatives of the savings and loan signed their names to a handwritten list of the Walkers' collateral equipment and prices:

| | |
|---|---|
| Loader | 7,500 |
| Skidder | 12,000 |
| Int'l Tractor | 5,000 |
| Ford Truck | 4,000 |
| Massey Ferguson | 4,000 |

These figures represented amounts the Walkers considered acceptable for the items.

On September 27, 1988, Frank Springer, on behalf of the savings and loan, wrote Edward Walker a handwritten message on the bottom of a statement of account for the defaulted note which read:

> Mr. Walker, This is to advise you that we will pick up the equipment pledged on the above contract no later than the 3rd day of October, 1988, unless you have been successful in selling the equipment before that time. The equipment will be included in our auction sale on October 8, 1988 at Sheridan. Should it fail to bring as much as the balance on the loan account you will then be responsible to

us for the deficency [sic].

Springer hand-delivered the message to the Walkers on September 27, 1988.

The savings and loan caused an auction flyer to be printed which advertised the sale of multiple items, including the Walkers' equipment, for 10:00 a.m. on October 8, 1988, at a designated site in Sheridan, Arkansas. According to Springer, this flyer was mailed to the Walkers on October 3, 1988. Two pieces of the Walkers' equipment were sold at the auction, but the Prentice loader and the 1976 Ford truck with the skidder mounted on it were not sold because the prices offered were inadequate.

Following the October 8, 1988 auction, Springer did receive an offer on the Prentice loader from Alvin Rogers and conveyed that offer by telephone to Edward Walker. Springer testified that Walker agreed to this sale. Springer also testified that he contacted Edward Walker about selling the 1976 Ford truck with the skidder to Billy Wilson and that he and Walker had three separate telephone conversations about it. According to Springer, Edward Walker first refused to sell at the offered price but then relented in late December, 1988. Ortha Walker testified that her husband "told me that Mr. Lamb [of the savings and loan] had called him and told him that they were getting ready to sell this equipment. . . ." She added that "the next day I got this letter that it was sold."

In answering a series of questions about his understanding of what was to happen to unsold equipment after the auction, Edward Walker said:

> Well, that was kind of an agreement that they was gonna sell it after, you know, that, uh, if somebody come by they were gonna agree they would sell it, get all we could out of it to pay on that note.

A deficiency resulted after sale of all the Walkers' collateral, and on April 10, 1989, the savings and loan filed suit against the Walkers in the amount of $30,865.04. A trial was held before the circuit court, and, following the savings and loan's case, the Walkers moved for a directed verdict on grounds that the sale of equipment was not conducted in a commercially reasonable manner and that reasonable notice of the sale was not given as

required by the Commercial Code. The trial court denied the motion and the Walkers rested their case, whereupon judgment was entered in favor of the savings and loan. In his judgment the trial court specifically found that a post-default agreement existed between the parties which was reasonable and which rendered the issues of notice of sale and commercial reasonableness "immaterial."

We do not agree and reverse the trial court's decision.

The savings and loan's primary argument before the trial court and on appeal is that it had an oral post-default agreement with the Walkers and that the oral agreement controlled the sale of the collateral equipment and eliminated the necessity for notice under the Code. As evidence of this agreement the savings and loan points to statements made by Edward Walker in a deposition taken in a related case concerning arrangements he had made with Mr. Lamb of the savings and loan:

Q. Okay. Did you make an agreement with Mr. Lamb that your equipment would be sold?

A. Yeah, we made an agreement that he was gonna sell it.

Q. Was the agreement ever put in writing?

A. On selling it?

Q. Yes, sir.

A. Well, now we did put in writing, but the price, he told me about what it would bring.

Q. So the writing was what his estimate was as to what he thought the equipment could bring?

A. Uh-huh.

* * *

Q. Okay? Was — now, I realize, and you stop me if I'm wrong, Mr. Walker, but in your own mind, what did you think the Savings and Loan was going to do with the equipment that didn't sell at the auction that Saturday?

A. Well, they was gonna wait for another — I mean, they were supposed to maybe have another auction or maybe somebody would come by and buy it before, you know, they had another auction.

Q. All right. Now, was that just something that was

in your mind or was that part of an agreement that you had with Mr. Lamb and Mr. Easley?

A. Well, that was kind of an agreement that they was gonna sell it after, you know, that, uh, if somebody come by, they were gonna - agree they would sell it, get all we could out of it to pay on that note.

Q. Okay. To get all they could?

A. Yeah, what I said, they were gonna sell it — they were waiting to get a big price for it while we were trying to get the note paid off.

In probing Ortha Walker for her understanding of any post-default agreement, she testified the savings and loan told the Walkers it would try to sell the equipment "for as much as they could get out of 'em."

■ We find no law in Arkansas to support the savings and loan's argument that an oral post-default agreement suffices to render Code notice requirements and commercial reasonableness immaterial. On the contrary, the one Arkansas case that deals with post-default agreements and waiver of notice requirements involved a written agreement signed by the parties which specifically waived all notices of sale. *Teeter Motor Co. v. First National Bank of Hot Springs*, 260 Ark. 764, 543 S.W.2d 938 (1976).

■ Under the Commercial Code the debtor has specific rights after default which are enumerated:

1. The debtor has those rights and remedies provided in the security agreement. Ark. Code Ann. § 4-9-501(2) (1987).

2. The sale of the debtor's collateral must be commercially reasonable as to method, time, place, and terms. Ark. Code Ann. § 4-9-504(3) (1987).

3. The secured party must send the debtor reasonable notice of the time and place of public sale of collateral and reasonable notice of the time after which private sales will be made, unless the debtor has signed a statement renouncing or modifying that right. Ark. Code Ann. § 4-9-504(3) (1987).

4. The debtor has the right to redeem the collateral by full payment of the debt before sale, unless otherwise agreed in writing. Ark. Code Ann. § 4-9-506 (1987).

The Code further provides that "the parties may *by agree-*

*ment* determine the standards by which the fulfillment of these rights and duties is to be measured if such standards are not manifestly unreasonable." [Emphasis ours.] Ark. Code Ann. § 4-9-501(3) (1987). The only reasonable interpretation of the "agreement" contemplated by this section is an agreement in writing. Indeed, at least one appellate court, in another jurisdiction, has interpreted the agreement reference in this section to be the original security agreement which outlined procedures for notice and sale in the event of default. *Chapman* v. *Field*, 124 Ariz. 100, 602 P.2d 481 (1979).

Any other interpretation does not withstand scrutiny. It would be radically inconsistent for the Code to underscore the debtor's security agreement rights and rights to written notice of sale on the one hand and then permit the erosion of those rights by imprecise oral understandings on the other. One clear policy reason underlying Article 9 default provisions is the protection of post default debtors from the potential of overbearing tactics and intimidation by secured parties. After default the secured party is unquestionably in a position of control and even dominance. To insure that the debtor is fully apprised of his rights and fully aware of the process for the disposition of his property, the Code contemplates that agreements and notices and modifications relating to the sale be in writing.

It should also be noted that the Walkers are not as sophisticated in default procedures as the savings and loan. Edward Walker is visually impaired and has been totally disabled since 1987. Under such circumstances the Code places the responsibility of compliance with its default provisions squarely on the secured party, and evidence of this compliance must be in writing.

The savings and loan places great weight on a case which held that Code notices are immaterial where the debtor either agreed to the sale of collateral or actually made the sale himself. *Pine Bluff Production Credit Ass'n* v. *Lloyd*, 252 Ark. 682, 480 S.W.2d 578 (1972). That case is distinguishable on its facts because it dealt with perishable collateral which is specifically excepted from the notice requirements of § 4-9-504(3).

We, therefore, hold today that in order for a post-default agreement to establish the commercial reasonableness of a sale of collateral and to govern the notices relating to such sales as

required by § 4-9-504 (3), it must be in writing. This holding certainly comports with our earlier decision considering such an agreement. *See Teeter Motor Company, Inc.* v. *First National Bank of Hot Springs*, 260 Ark. 764, 543 S.W.2d 938 (1976).

In the various dealings between the Walkers and the savings and loan, there is no writing that rises to the level of a post-default agreement. The only writing that even arguably could qualify is a list of equipment and prices signed by the parties on September 8, 1988. This casual list falls far short of a document establishing the commercial reasonableness of the sale.

A closer question is whether the savings and loan gave reasonable notice of sale to the Walkers as required under § 4-9-504(3). The savings and loan does not argue this point but prefers to rest its case on the existence of an oral post-default agreement. Nevertheless, the savings and loan clearly discussed the sale of collateral with the Walkers. The parties then signed the property list containing prices on September 8, 1988, and on September 27, 1988, Frank Springer at the savings and loan gave the Walkers notice of repossession, stating, "The equipment will be included in our auction sale on October 8, 1988 at Sheridan." Springer says he personally gave this memorandum to Edward Walker.

The Code is precise about what is required of the secured party in terms of notice:

> Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms, but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, if he has not signed after default a statement renouncing or modifying his right to notification of sale.

Ark. Code Ann. § 4-9-504(3) (1987). We have held that the notice requirements of § 4-9-504(3) must be consistently adhered

to. *First State Bank of Morrilton* v. *Hallett*, 291 Ark. 37, 722 S.W.2d 555 (1987). We have further held that a debtor's prior knowledge of the sale of collateral is not sufficient to satisfy this section in the absence of written notice:

> Knowledge of repossession does not equate with notice of sale, nor does knowledge that an automobile [the collateral] will be sold. The debtor is entitled to notification of a specific date after which the creditor intends to dispose of the property. This would provide the debtor a fixed period within which to protect himself from an inadequate sale price in any manner he saw fit.

*Wheeless* v. *Eudora Bank*, 256 Ark. 644, 648, 509 S.W.2d 532, 534-535 (1974).

The handwritten message from Springer to Edward Walker does refer to a date and town. It was also hand-delivered, according to Springer, eleven days before sale, thus complying with the ten day notice-of-sale requirement contained in the security agreement signed by the parties. But there is no reference in the message to time of sale, or to specific location of sale, or to the method, manner, and terms of the sale other than the fact it was to be an auction. Any reference to private sales to be held after the auction was also omitted, and no subsequent written notice was given to either Walker about private sales.

Nor does the auction flyer mailed to the Walkers on October 3, 1988, satisfy the Code requirements. It did not meet the test of commercial reasonableness under the security agreement because it did not comply with the ten day notice requirement.

We have previously held that the debtor is entitled to notice of the time and place of a public sale and notice of the date after which a private sale will be made as the Commercial Code provides. *See Barker* v. *Horn*, 245 Ark. 315, 432 S.W.2d 21 (1968). We have further held that "[w]hen a creditor repossesses chattels and sells them without sending the debtor notice as to the time and date of sale, or as to a date after which the collateral will be sold, he is not entitled to a deficiency judgment, unless the debtor has specifically waived his rights to such notice." *Rhodes* v. *Oakland Bank*, 279 Ark. 51, 55, 648 S.W.2d 470, 471-472 (1983). Hence, the failure of the secured party to give written

notice under § 4-9-503(4) of the Commercial Code or otherwise to establish the commercial reasonableness of the sale by written agreement with the debtor will bar the secured party from any right to a deficiency. *See Bank of Dover* v. *Shipley*, 299 Ark. 451, 773 S.W.2d 825 (1989). As we observed recently, "The rule and requirement are simple. If the secured party wishes a deficiency judgment, he must obey the law. If he does not obey the law, he may not have his deficiency judgment." *First State Bank of Morrilton* v. *Hallett*, 291 Ark. 37, 41, 722 S.W.2d 555, 557 (1987); *quoting Atlas Thrift Co.* v. *Horan*, 27 Cal. App. 3d 999, 104 Cal. Rptr. 315 (1972).

■ There is, finally, the issue of whether the Walkers waived notice requirements under the Commercial Code by their actions or whether the doctrine of estoppel applies. The Code specifies that any modification or renunciation of notice must be a "statement" signed by the debtor. Ark. Code Ann. § 4-9-504(3) (1987). No such statement was signed by the Walkers in this case about either the public auction or the later private sales. Because a statement in writing signed by the debtors does not exist, waiver cannot be established by the savings and loan, and the debtors are not estopped to raise failure to give adequate notice as a bar to the deficiency judgment. To the extent that *Pollack* v. *Pulaski Bank & Trust Co.*, 30 Ark. App. 20, 781 S.W.2d 497 (1989) stands for the proposition that written notice of sale is not required, we overrule that decision.

Again, we are mindful that the savings and loan relied solely on the theory of an oral post-default agreement between the parties which obviated the need for written notices or compliance with the commercial reasonableness requirements of the Code. The trial court adopted that theory as its conclusion of law. Though the Walkers argued before the trial court and on appeal that failure to give written notice and failure to sell the collateral in a commercially reasonable manner were defenses, this argument was not countered by the savings and loan. Indeed, the savings and loan did not present evidence that it had complied with § 4-9-504(3) because compliance, according to its theory, was immaterial. Nevertheless, the record appears complete on what was done by the savings and loan in the way of contacts with the Walkers following default on their loan.

The decision of the trial court is reversed and the case dismissed.

DUDLEY, HAYS, and GLAZE, JJ., dissent.

ROBERT H. DUDLEY, Justice, dissenting. I wholly agree with the recitation of facts set out in the majority opinion, but I dissent from that opinion because I draw different legal conclusions from those facts.

First, it is my opinion that the notice requirements were satisfied with respect to the public sale of collateral, and thus, on that basis, I would affirm that portion of the judgment with respect to both Mr. and Mrs. Walker. Second, with respect to the private sales following the auction, I think the result reached by the trial court concerning Mr. Walker was correct, but should have been addressed in terms of estoppel rather than a "post-default agreement" between the parties. Third, I do not think Mrs. Walker received adequate notice of the private sales, nor do I think that she is estopped from asserting lack of notice. Consequently, appellee should not be permitted to obtain a deficiency judgment against Mrs. Walker with respect to the items sold at private sales.

I.

### Notice — Public Sale

The Code provides that "reasonable notification of the time and place of any public sale. . . shall be sent by the secured party to the debtor,. . . ." Ark. Code Ann. § 4-9-504(3) (1987). In addition, the parties had previously agreed that "notice will be considered commercially reasonable if provided by first class mail . . . [and] mailed ten (10) days before the date of the intended disposition." As set out in the majority opinion, appellee hand-delivered a document to the appellants on September 27, 1988, eleven (11) days before the auction. It provided, "The equipment will be included in our auction sale on October 8th, 1988 at Sheridan." The hand-delivery of that document, informing appellants of the date and town where the auction would be held, constituted reasonable notification of the "time" and "place" of the public sale. If appellants wanted a more specific time and location of the sale, they could have asked appellee's representative at that time or at any time before the October 8 sale date.

Additionally, appellee mailed the printed auction announcement on October 3, 1988, five days prior to the auction, which established the more precise time and location for the auction. Finding that the notice requirements were satisfied with respect to the public sale, I would affirm the trial court on that basis, and not on the basis of a "post-default agreement."

## II.

### *Notice — Private Sales*

With respect to the two private sales occurring after the auction, the Code provides, "reasonable notification of the time after which any private sale . . . is to be made shall be sent by the secured party to the debtor, if he has not signed after default a statement renouncing or modifying his right to notification of sale." Ark. Code Ann. § 4-9-504(3) (1987). There is nothing in the record which would constitute a post-default statement, signed by the appellants, renouncing or modifying their right to notification of sale; and that is the only type of "post-default" agreement contemplated by § 4-9-504(3) (1987), and therefore allowed by § 4-9-501(3) (1987), which provides in pertinent part:

> (3) To the extent that they give rights to the debtor and impose duties on the secured party, the rules stated in the subsections referred to below *may not be waived or varied except as provided* with respect to compulsory disposition of collateral (§ 4-9-504 . . .), . . .:
>
> . . .
>
> (b) Section 4-9-504(3) . . . which deal with disposition of collateral;

Further, I agree with the majority that the September 27, 1988, notice to appellants omitted any reference to private sales to be held after the auction, and no subsequent written notice was given to appellants concerning the private sales.

I depart from the majority opinion, however, concerning the applicability of the doctrine of estoppel in this case. The majority addresses the doctrines of waiver and estoppel as if they were entirely interchangeable. While I agree that the distinctions between an implied waiver and equitable estoppel are sometimes

blurred, I think it is important to preserve the distinctions. Waiver involves a voluntary and intentional abandonment or relinquishment of a known right. *Worth* v. *Civil Serv. Comm'n*, 294 Ark. 643, 746 S.W.2d 364 (1988); 28 Am. Jur. 2d, *Estoppel & Waiver* § 30 (1966). I agree that there was no express waiver here because, as just discussed, § 4-9-504(3) requires such a waiver of notice to be a written renunciation or modification.

Equitable estoppel, however, is a term applied to à situation where, because of something which he has done or omitted to do, a party is denied the right to plead or prove an otherwise important fact. It involves both, not just one, of the parties, and the party claiming it must show that it detrimentally changed its position based upon the other party's conduct. *Worth, supra*; 28 Am. Jur. 2d, *Estoppel & Waiver* § 27 (1966). The Code recognizes and permits the application of the doctrine of estoppel. See Ark. Code Ann. § 4-1-103 (1987) which provides, "Unless displaced by the particular provisions of this subtitle, *the principles of law and equity, including . . . the law relative to . . . estoppel . . . shall supplement its provisions.*" (Emphasis added.) Further, in *Wheeless* v. *Eudora Bank*, 256 Ark. 644, 509 S.W.2d 532 (1974), we recognized the applicability of the doctrine of estoppel even though it was not called for in that case:

> We are committed to the doctrine that, since estoppel bars the truth to the contrary, the party asserting it must prove it strictly, there must be certainty to every intent, the facts constituting it must not be taken by argument or inference and nothing can be supplied by intendment.

Further, while we discussed the issue in terms of notice being "immaterial" in *Pine Bluff PCA* v. *Lloyd*, 252 Ark. 682, 480 S.W.2d 578 (1972), it seems to me the real basis for that opinion lies in the doctrine of equitable estoppel. If *Lloyd* could be distinguished solely on the basis that it involved perishable collateral, it would not have been necessary for this Court to have relied so heavily on the finding of fact that H.G. Lloyd had made the sale. *See also., Ralston-Purina Co.* v. *Bertie*, 541 F.2d 1363 (9th Cir. 1976); *Appleton State Bank* v. *Van Dyke Ford, Inc.,* 90 Wes. 2d 200, 279 N.W.2d 443 (1979); *Umbaugh Pole Bldg. Co., Inc.* v. *Scott*, 58 Ohio 2d 282, 12 Ohio Ops 3d 279, 390 N.E.2d 320 (1979); *Commercial Credit Corp.* v. *Wollgast*, 521 P.2d

1191 (Wash. App. 1974); and *Nelson* v. *Monarch Inv. Plan, Inc.*, 452 S.W.2d 375 (Ky. 1970). Finally, although not controlling, I find the case of *Pollack* v. *Pulaski Bank & Trust Co.*, 30 Ark. App. 20, 781 S.W.2d 497 (1989) persuasive. Consequently, I would adopt the reasoning of *Pollack* on the issue of estoppel, rather than overruling it as the majority has done.

Accordingly, because it is undisputed that Mr. Walker engaged in discussions with appellee concerning the two private sales, even refusing one offered price for some time; Mr. Walker agreed to the sales; and appellee relied on those agreements and changed its position to its detriment with respect to that collateral, I conclude that Mr. Walker should be estopped to assert any defense concerning lack of notice.

### III.

#### *Notice — Mrs. Walker*

The only evidence concerning Mrs. Walker's knowledge of the private sales was that her husband "told me that Mr. Lamb [appellee's representative] had called him and told him that they were getting ready to sell this equipment. . . ." The next day she received a letter informing her that the equipment was sold. For all of the reasons previously discussed it is clear that Mrs. Walker neither received nor waived notice under the applicable code provisions. Further, while it is true that inaction will sometimes serve as the basis for equitable estoppel, the facts do not support application of that doctrine to Mrs. Walker. In short, she did not engage in the discussions concerning the private sales; she did not agree to them; and one day's inactivity in objecting to the agreed upon sales does not provide the strict proof required for appellee to be able to assert the doctrine with respect to Mrs. Walker.

In sum, I would affirm the trial court's ruling that Mr. Walker is liable for the entire deficiency, but I would reverse the ruling to the extent that it also found Mrs. Walker liable for the entire deficiency. Her liability should be reduced by the sums received at the two private sales, $6,885 and $8,000, for a total reduction of $14,885.

HAYS and GLAZE, JJ., join in this dissent.