Justice Laurie McKinnon, dissenting.
¶39 I agree with the Court that the parties' "release" (2015 Agreement), which attempted to terminate their earlier installment sales contract and security agreement, did not remove further application of Title 30, chapter 9A, MCA, which governs secured transactions. However, the Court creates new requirements for parties attempting to terminate a security agreement through § 30-9A-620, MCA (strict foreclosure), by finding RJC did not properly consent to accepting Kapor's mobile home in satisfaction of her obligation to RJC. In doing so, the Court elevates form over substance, overlooking the plain language of the 2015 Agreement and the very reasons RJC and Kapor signed it in the first place. I would find the parties met the requirements under § 30-9A-620, MCA, for strict foreclosure. Kapor ***329 transferred her rights in the mobile home to RJC in exchange for RJC's discharge of Kapor's obligation. Kapor is not entitled to a surplus from RJC's sale of the mobile home. Therefore, I dissent.
¶40 The parties' initial security agreement for the mobile home placed them squarely within the ambit of Title 30, chapter 9A, MCA. Section 30-9A-109, MCA. The Court soundly analyses why principles of common law and equity cannot supplant provisions of Title 30, MCA. However, the Court's analysis omits § 30-1-302, MCA, which specifies that parties may, in fact, contract around many provisions of Title 30, MCA. This option for contracting parties merits further discussion.
¶41 Under § 30-1-302, MCA, parties are generally free to vary the provisions of Title 30, MCA, by agreement. Parties may not, however, vary obligations of good faith, diligence, reasonableness, care, or certain other provisions of Title 30, MCA, that prohibit variation by agreement. Section 30-1-302(1), (2), MCA. Section 30-9A-602, MCA, is one such limiting provision-it expressly prevents parties from varying, by agreement, the rules in several statutes regarding default, including §§ 30-9A-608(1) and -615(4), MCA, "to the extent that they require accounting for or payment of surplus proceeds of collateral." Section 30-9A-602(5), MCA. Sections 30-9A-608(1) and -615(4), MCA, specifically govern a debtor's right to a surplus after default, and § 30-9A-602(5), MCA, prevents the debtor from waiving her right to a surplus if she is in default. See § 30-9A-607, MCA (collection and enforcement procedure after default); § 30-9A-608, MCA (application of proceeds of collection or enforcement after default); § 30-9A-610, MCA (disposition of collateral after default); § 30-9A-615, MCA (application of proceeds of disposition of collateral after default). However, no similar right exists when the debtor is not in default: the statutes leave open the possibility that the debtor and creditor could mutually agree to exchange the collateral and terminate their security agreement without triggering § 30-9A-602(5), MCA. Section 30-9A-602, MCA, simply prevents the parties from waiving or varying-whether as part of their initial security agreement or pursuant to a later agreement-certain rights and duties that arise upon the debtor entering default.
¶42 After Kapor defaulted on her security agreement with RJC, Kapor and RJC attempted to execute an instrument-the 2015 Agreement-that obviated further rights or duties arising from the initial security agreement between them. RJC argues standard contract rules should apply to the parties' relationship because RJC was no longer a "secured party" and Kapor was no longer a "debtor" after signing the 2015 Agreement. However, ***330 Title 30, chapter 9A, MCA, clearly began regulating their relationship when the parties signed their initial security agreement, and it still regulated their relationship when they signed the 2015 Agreement. When signing the 2015 Agreement, the parties could not, as a matter of law, vary certain provisions of Title 30, MCA, including the rights and duties enumerated in *881 § 30-9A-602, MCA. Section 30-1-302, MCA ; § 30-9A-602, MCA. Yet, to some degree, the 2015 Agreement attempted to do just that. While the parties were generally free to contract around Title 30, MCA, they could not contract around the rights and duties enumerated in § 30-9A-602, MCA. Those rights and duties, which Kapor was entitled to at the time because she was in default, continued beyond the 2015 Agreement.
¶43 RJC also argues, pointing to Comment 3 of § 30-9A-602, MCA, that the general prohibition against waiving certain rights and duties under § 30-9A-602, MCA, should not apply because the 2015 Agreement was an attempt by the parties to settle a claim. Comment 3 states,
This section provides generally that the specified rights and duties "may not be waived or varied." However, it does not restrict the ability of parties to agree to settle, compromise, or renounce claims for past conduct that may have constituted a violation or breach of those rights and duties, even if the settlement involves an express "waiver."
Section 30-9A-602, MCA, Official Comment 3.
¶44 Comment 3 encourages parties to settle and waive claims for conduct that may have violated the enumerated rights and duties in § 30-9A-602, MCA. See 11 Part II David Frisch & Scott Siegner, Lawrence's Anderson on the Uniform Commercial Code § 9-602:3 (3d. ed. 2017) (" UCC 9-602 [Rev] does not ... restrict the ability of parties to agree to settle, compromise, or renounce claims for past conduct that may have been a violation, or breach, of those rights or duties." (emphasis added)). Comment 3 allows a party to expressly waive a past violation of a particular right, but it does not indicate the party may waive the right itself . For example, if a secured party violates a debtor's rights under § 30-9A-602, MCA, the debtor can "waive" or "renounce claims for past conduct " against the secured party as part of a settlement agreement. See § 30-9A-602, MCA, Official Comment 3 (emphasis added). Nevertheless, the debtor cannot also waive her extant rights under § 30-9A-602, MCA, as part of the settlement agreement.
¶45 RJC's contrary interpretation would nullify the plain meaning of § 30-9A-602, MCA, that the parties "may not waive or vary the rules"
***331 stated in the statute. These protections are especially important when the debtor is in default because a secured party could almost always argue that a waiver of the debtor's ongoing protections under the statute is merely part of a settlement or compromise. See Walker v. Grant Cty. Sav. & Loan Ass'n, 304 Ark. 571, 803 S.W.2d 913, 916 (1991) ("One clear policy reason underlying Article 9 default provisions is the protection of post default debtors from the potential of overbearing tactics and intimidation by secured parties. After default the secured party is unquestionably in a position of control and even dominance."); Frisch, supra , 11 Part II § 9-602:3 ("Where, as in the relationship between a secured party and a debtor, there is a substantial inequality of bargaining power, freedom of contract must be limited so as to avoid the debtor being taken advantage of."). Regardless, as RJC itself points out, the Official Comments are nonbinding authority that courts should disregard in light of the plain meaning of the statute's terms. See Frisch, supra , 1 § 1-102:33 (3d. ed. 2017) ("The official comments are persuasive, although not controlling authority, and provide guidance in interpreting the UCC.").
¶46 Notwithstanding my agreement with the Court's conclusion regarding the first issue, I would hold the District Court did not err in determining that the 2015 Agreement constituted RJC's acceptance of the mobile home in full satisfaction of Kapor's secured obligation after Kapor defaulted on the security agreement-a strict foreclosure under § 30-9A-620, MCA. Because strict foreclosure does not require the secured party to dispose of the collateral, its finality prevents the secured party from seeking a deficiency and the debtor from seeking a surplus. See Miller, supra , 9C § 9-620-1 [Rev] (discussing the advantages and disadvantages of strict foreclosure, including the debtor's loss of the right to a surplus and the secured party's loss of the right to a deficiency); see also § 30-9A-620(5), MCA (stating, in strict foreclosure, the secured party must dispose of the collateral only in certain circumstances); see generally § 30-9A-620 to - 622 (strict foreclosure *882 process). The Court concludes RJC did not properly consent to strict foreclosure, centering much of its analysis on a questionable interpretation of Comment 5 to § 30-9A-620, MCA. As I will explain, Comment 5 is a protective measure for secured parties. The Court uses it as a sword against RJC-but it is really a shield.
¶47 To execute a strict foreclosure after default, § 30-9A-620(2)(a), MCA, requires the secured party to consent to accepting the collateral in full or partial satisfaction of the obligation the collateral secures. The secured party may consent through an "authenticated record" or by sending "a proposal to the debtor" after certain other conditions are ***332 met. Section 30-9A-620(2), MCA. However, "[a] debtor's voluntary surrender of collateral to a secured party and the secured party's acceptance of possession of the collateral does not, of itself, necessarily raise an implication that the secured party intends or is proposing to accept the collateral in satisfaction of the secured obligation under this section." Section 30-9A-620, MCA, Official Comment 5.
¶48 The Court interprets Comment 5 to mean the "authenticated record" between the debtor and secured party must include definite, express language that a secured party "accepted or consented to accept the collateral in full satisfaction of the debt" and "relinquished its right to pursue a deficiency judgment." Opinion, ¶ 23. The Court goes on to criticize RJC and imply that it should have intended the 2015 Agreement to satisfy the explicit requirements of § 30-9A-620, MCA, before it could properly consent to a strict foreclosure. Opinion, ¶ 27.
¶49 The Court's criticisms of the 2015 Agreement disregard a fundamental principle of contracts, and especially, secured transactions: that of substance over form. See § 30-9A-109 ("[T]his chapter applies to ... any transaction, regardless of its form, that creates a security interest...."); see also § 1-3-219, MCA ("The law respects form less than substance."); In re Charles M. Bair Family Trust , 2008 MT 144, ¶ 32, 343 Mont. 138, 183 P.3d 61 ("When interpreting an instrument, we emphasize substance over form...."). The Court generates several formal language requirements for an authenticated record under § 30-9A-620, MCA, when here, although the 2015 Agreement does not contain definite language that RJC "accepted or consented to accept the collateral in full satisfaction of the debt" and "relinquished its right to pursue a deficiency judgment," the substance of the 2015 Agreement is clear and unambiguous. Kapor expressly gave up rights in the mobile home in exchange for RJC releasing her from their installment contract and security agreement-a strict foreclosure by any other name.
¶50 Furthermore, the Court misinterprets the purpose behind Comment 5. Adopted by the Legislature in 1999, § 30-9A-620, MCA, replaced former § 30-9-505, MCA (repealed 1999). 1999 Mont. Laws ch. 305. Prior to 1999, some debtors' interpretations of former § 30-9-505, MCA, confronted courts with the issue of "constructive" strict foreclosures: occasionally, debtors attempted to force strict foreclosures upon unwilling secured creditors after the creditors took possession of the collateral without taking further action. In the absence of a modifying agreement, some courts held the creditor had constructively, strictly foreclosed, barring it from pursuing any deficiency. 4 James J. White, Robert S. Summers, & Robert A. Hillman, Uniform ***333 Commercial Code: Practitioner Treatise Series § 34:20, at 596 (6th ed. 2015); see Section 30-9A-620, MCA, Official Comment 2, 5. Section 30-9A-620, MCA, entirely reorganized and substantially revised § 30-9-505, MCA, to eliminate "constructive" strict foreclosure. See § 30-9A-620, MCA, Official Comment 2 ("[T]his section eliminates much of the awkwardness of former [ § 30-9-505, MCA ]."). A fuller reading of Comment 5 reveals the requirement of the secured party's consent under § 30-9A-620, MCA, now exists to prevent the same:
To ensure that the debtor cannot unilaterally cause an acceptance of collateral, [subsection (2) ] provides that compliance with [subsection (1) ] is necessary but not sufficient to cause an acceptance of collateral. Rather, under [subsection (2) ], acceptance does not occur unless, in addition, the secured party consents to the acceptance in an authenticated record or sends to the *883 debtor a proposal. For this reason, a mere delay in collection or disposition of collateral does not constitute a "constructive" strict foreclosure.
Section 30-9A-602, MCA, Official Comment 5.
¶51 Section 30-9A-620, MCA, requires creditors to consent to a strict foreclosure as a protective measure. If the statute did not require a creditor's consent before a debtor could impose a strict foreclosure, the creditor could lose its right to pursue a deficiency without ever intending to do so. Comment 5 only serves to negate any presumption of the creditor's intent without its taking further action. Comment 5 does not create affirmative language requirements for the authenticated record itself, especially where the record-the contract's plain language and, if necessary, extrinsic evidence-shows the creditor intended to release the debtor from the debtor's obligation in exchange for the debtor's rights in the collateral.
¶52 This case is distinguishable from Smith , Peoples Bank , and Royal Palm Senior Investors, LLC , which the Court relies upon. Opinion, ¶ 26. Each case concerned a debtor attempting to impose a strict foreclosure on an unwilling creditor-all three bearing a resemblance to pre-1999 constructive strict foreclosures. Smith , 344 S.W.3d at 563-65 ; Peoples Bank, at *1-3, 2014 U.S. Dist. LEXIS 6428, at *5-9; Royal Palm Senior Investors, LLC , at *1-2, 2009 U.S. Dist. LEXIS 57452, at *2-7. Each case concerned a purported authenticated record that made no mention of terminating the underlying obligation, and in each case the creditor argued the text of the record indicated it did not consent to strict foreclosure. Smith , 344 S.W.3d at 573 ; Peoples Bank, at *2, *5, 2014 U.S. Dist. LEXIS 6428, at *7, *16;
***334 Royal Palm Senior Investors, LLC, at *1-2, *3-4, 2009 U.S. Dist. LEXIS 57452, at *3-4, *9-12. In Smith and Royal Palm Senior Investors, LLC , the courts agreed with the creditors that they had not consented to strict foreclosure because the authenticated records did not clearly show the creditors intended to execute a strict foreclosure. Smith , 344 S.W.3d at 573 ; Royal Palm Senior Investors, LLC, at *3-4, 2009 U.S. Dist. LEXIS 57452, at *9-12. In Peoples Bank , the district court found genuine issues of material fact existed because extrinsic facts-especially the creditor's decision to record a "Satisfaction of Mortgage" after the debtor transferred rights in the collateral-indicated the creditor may have consented to strict foreclosure. Peoples Bank , at *2-3, *5 n. 5, 2014 U.S. Dist. LEXIS 6428, at *9, *17 n. 5.
¶53 All three cases are distinguishable for two reasons. First, as I will explain, unlike the purported authenticated records in each of the other cases, the 2015 Agreement explicitly states the parties agreed to "releasing [Kapor] and removing [her] name" from the installment sales contract and security agreement-i.e., the parties agreed to terminate it. Second, in each of the other cases, the debtor claimed the creditor did consent to strict foreclosure while the creditor claimed it did not . Kapor, however, claims RJC did not consent to strict foreclosure while RJC claims it did . The distinction is important-here we have a debtor who raises no issues about whether she consented to transfer her rights in the collateral in exchange for terminating her obligation. Instead, her argument rests on the bizarre premise that the 2015 Agreement did not actually terminate her obligation because RJC, the creditor , did not consent. Put another way, Kapor simply has buyer's remorse.
¶54 Today, the Court turns a protective measure for secured parties against them, and it creates additional requirements-unsupported by the statute-for strict foreclosure, elevating form over substance. In a case such as this, the statute requires only that "the secured party consents to the acceptance [of the collateral] in an authenticated record." Section 30-9A-620(2), MCA. That provision exists to prevent debtors from imposing strict foreclosure onto unwilling creditors. The Court's interpretation, however, essentially tells secured parties they cannot consent to strict foreclosure-the very thing they attempt to consent to-unless their authenticated record contains certain express language. The Court states, "RJC's afterthought in reply that the [2015 Agreement's] purpose satisfied the elements of strict foreclosure is further indication that RJC did not *884 intend the [2015 Agreement] to satisfy § 30-9A-620, MCA, when it was executed." Opinion, ¶ 27. However, whether RJC had the specific legal doctrine of strict ***335 foreclosure and a specific statute in mind before it signed the 2015 Agreement does not change whether the 2015 Agreement met the requirements of strict foreclosure. The 2015 Agreement clearly establishes that RJC consented to accepting the mobile home in satisfaction of Kapor's debt. The Court's contrary holding sends a problematic message to creditors: the form of a strict foreclosure takes priority over its substance.
¶55 But that is not how Montana courts construct and interpret agreements. Whether a contract is ambiguous is a question of law-ambiguity exists if "the language of the contract, as a whole, could reasonably be subject to two different meanings." Watters , ¶ 16 (quoting Kuhr v. City of Billings , 2007 MT 201, ¶ 18, 338 Mont. 402, 168 P.3d 615 ). As the Court recognizes, Opinion, ¶ 24, if a contract provision is clear and unambiguous, a court must apply the language as written; however, if the provision is ambiguous, the parties' intent is a question of fact that the court may allow the parties to introduce extrinsic evidence to prove. Watters , ¶ 16.
¶56 Kapor and RJC signed the 2015 Agreement where Kapor agreed: "[I hereby] release all rights to the manufactured home ... [and am] releasing myself and removing my name off the contract currently in place with RJC Investment, Inc." Kapor further agreed to release any rights in the home, including any refund of payments she previously made. These two provisions represent the entirety of the 2015 Agreement.
¶57 Through the plain meaning of the text, Kapor was clearly attempting to release any rights she had in the manufactured home, and RJC was clearly attempting to release Kapor from any further obligations by terminating the installment sales contract and security agreement. The Court faults RJC because it did not specify that it accepted the mobile home in satisfaction of Kapor's debt and would not pursue a deficiency against her. However, the phrase "releasing myself and removing my name off the contract currently in place with RJC" is clear and unambiguous language indicating the parties were agreeing to release Kapor from her obligations and terminate their contract-they did not need to say more. The parties wrote the phrase from Kapor's first-person point-of-view, but both parties signed the agreement. The phrase clearly represented a mutual understanding that the parties intended to terminate their installment sales contract and security agreement. The 2015 Agreement left both RJC and Kapor without any remaining rights against each other, including their respective rights to pursue a deficiency and surplus. Substantively, the parties intended to execute a strict foreclosure.
***336 ¶58 Alternatively, even if the contract is ambiguous and the phrase "releasing myself and removing my name off the contract currently in place with RJC" is unclear, the parties do not dispute any material facts, and they do not dispute their intent. The record shows the parties agreed that the "contract" they intended the 2015 Agreement to refer to is the installment sales contract and security agreement between Kapor and RJC that financed Kapor's mobile home. The parties also agreed Kapor was in default on their contract, that she vacated her mobile home, and that she allowed RJC to take possession of it by the time they signed the 2015 Agreement.
¶59 Kapor could not terminate her contract with RJC and transfer ownership unilaterally-she needed RJC's consent in an authenticated record. See § 30-9A-620(2), MCA. Despite that, the parties awkwardly wrote and framed the 2015 Agreement from Kapor's first-person point-of-view, which arguably generated some ambiguity for some of its terms. The agreement states, from Kapor's point-of-view, "[I] ... release all rights to the manufactured home ... [and] am releasing myself and removing my name off the contract...." However, Kapor clearly could not release herself or remove her name from the contract (i.e., terminate it) or transfer ownership of the mobile home to RJC without RJC's consent. Notwithstanding, RJC gave its consent when it signed the 2015 Agreement. RJC's co-owner stated the following in a sworn affidavit: "As part of vacating the mobile home, [Kapor] signed [the *885 2015 Agreement] on March 12, 2015. The purpose of the [2015 Agreement] was to terminate the Contract, and extinguish any further obligations [Kapor] would have to RJC under its terms and vice versa. I signed the [2015 Agreement] on behalf of RJC." Kapor never disputed RJC's affirmation about the parties' intent when entering into the 2015 Agreement-indeed, she agreed in her answer to RJC's motion for summary judgment that the parties did not dispute any material fact.
¶60 Thus, the surrounding circumstances demonstrate Kapor was attempting to give up any rights she had in the mobile home, transfer her rights to RJC, and terminate the security agreement with RJC, just like a debtor would in strict foreclosure. The surrounding circumstances also indicate RJC consented to Kapor giving up her rights in the mobile home, transferring her interest in the home to RJC, and terminating the security agreement between them-effectively, the parties executed a strict foreclosure. See § 30-9A-620, MCA.
¶61 The language of the parties' 2015 Agreement is clear, even if it does not specifically itemize which rights the parties agreed to forego ***337 by signing it: the language states Kapor released any rights in the mobile home and RJC agreed to release Kapor and terminate the parties' installment sales contract and security agreement. In substance, the parties intended to execute a strict foreclosure. Nevertheless, even if the 2015 Agreement is ambiguous, the parties do not dispute any material facts. By looking to the circumstances under which the parties executed it and the extrinsic evidence regarding the parties' intent, the purpose of the 2015 Agreement is plain. Either way, this case simply involves a debtor and a creditor, through a signed agreement, attempting to consent to a transfer of collateral to the creditor in full satisfaction of the debtor's obligation. See § 30-9A-620, MCA. The Court turns a blind eye to the 2015 Agreement's plain language and invalidates the very thing the parties attempted to do-worse, it invalidates the 2015 Agreement by elevating form over substance, and it dismisses the 2015 Agreement because of technicalities the Court itself has only fashioned today. Although I would hold Title 30, MCA, governs the parties' attempt to terminate their initial security agreement, I would hold the parties met the requirements of § 30-9A-620, MCA, for strict foreclosure. I therefore would hold Kapor is not entitled to whatever surplus RJC received from the mobile home's sale. Accordingly, I dissent.
DIRK M. SANDEFUR, J.
JIM RICE, J.