Justice Laurie McKinnon, dissenting.
¶24 I agree with the Court that the District Court erred when it failed to first determine whether Hutzenbiler was in default before holding Title 30, MCA, did not apply to Hutzenbiler and RJC's relationship after they signed the Full Release of Contract ("2015 Agreement"). Notwithstanding, based on the existing record, I would hold Hutzenbiler was not in default when she signed the 2015 Agreement. Therefore, she is not entitled to any surplus from the mobile home's sale provided for under Title 30, chapter 9A, part 6, MCA ("Part 6"), which governs default in secured transactions. Furthermore, even if Hutzenbiler was in default, then the District Court's alternative conclusion-that Hutzenbiler and RJC executed a strict foreclosure-was correct. Accordingly, I would affirm the District Court's order granting summary judgment in favor of RJC.
¶25 The Court states that the District Court must decide the question of default on remand, but it provides no guidance to the District Court ***259 for how to evaluate whether Hutzenbiler was in default, and it fails to paint a clear picture of why the issue of default is so important to begin with. Thus, I will explain its importance here: if Hutzenbiler was not in default when she executed the 2015 Agreement, she is not entitled to any surplus from the mobile home's sale. Further, the parties do not dispute any material facts, and Hutzenbiler's payment record and security agreement are part of the record on appeal. The record establishes that Hutzenbiler was not in default when she executed the 2015 Agreement. Where the material facts are undisputed, we "identify the applicable law, apply it to the uncontroverted facts, and determine who prevails." Yorlum Props., Ltd. , ¶ 12.
¶26 Part 6 governs default in secured transactions. Default triggers certain rights provided under Part 6 for both secured parties and debtors, but those rights do not exist before default. Section 30-9A-601(4), MCA ("Except as otherwise provided ... after default , a debtor and an obligor have the rights provided in this part and by agreement of the parties." (emphasis added)); § 30-9A-601(1), MCA ("After default , a secured party has the rights provided in this part and, except as otherwise provided in [§] 30-9A-602, [MCA,] those provided by agreement of the parties." (emphasis added)). For example, a secured party may take possession of collateral after default, but it may not do so before. Section 30-9A-609(1)(a), MCA ; see Padin v. Oyster Point Dodge , 397 F.Supp.2d 712, 725 (E.D. Va. 2005) (interpreting Virginia's version of § 30-9A-609, MCA : "A secured party may take possession of the collateral, but only after default." (emphasis in original)). Similarly, a debtor is only entitled to a surplus under §§ 30-9A-615 and -616, MCA, after default, because the statutory mechanisms that lead to a surplus-for example, the secured party's possession and disposition of the collateral under *384 §§ 30-9A-609 and -610, MCA -can only occur after the debtor defaults.
¶27 Part 6 provides fundamental protections for debtors and specific statutory procedures that secured parties must follow to possess and dispose of collateral after a debtor is in default. These protections are especially important because a debtor in default is in a substantially inferior bargaining position. See Walker v. Grant Cty. Sav. & Loan Ass'n, 304 Ark. 571, 803 S.W.2d 913, 916 (1991) ("One clear policy reason underlying Article 9 default provisions is the protection of post default debtors from the potential of overbearing tactics and intimidation by secured parties. After default the secured party is unquestionably in a position of control and even dominance."). However, when the debtor is not in default, the debtor and creditor can mutually agree to exchange the collateral and terminate their security agreement ***260 without triggering Part 6. And this makes sense: when the debtor is not in default-when the parties hold more balanced positions of bargaining power-the parties must be able to exchange the collateral, terminate their security agreement, and go their separate ways without concern that the default procedures of Part 6 will impede their ability to do so. Debtors have a significant interest in avoiding the negative consequences of a default proceeding.
¶28 How courts should define default varies from case to case. Neither Title 30, MCA, nor the UCC define the term "default." Black's Law Dictionary defines "default" as "[t]he omission or failure to perform a legal or contractual duty; esp., the failure to pay a debt when due." Default , Black's Law Dictionary (10th ed. 2014). In most cases, however, default is simply "whatever the security agreement says it is." 4 James J. White, Robert S. Summers, & Robert A. Hillman, Uniform Commercial Code: Practitioner Treatise Series § 34:5, at 530 (6th ed. 2015) (internal quotations and footnotes omitted). Thus, in order to determine whether a party is in default, courts should look first to the security agreement itself. Here, the parties' original security agreement ("2010 Security Agreement") states what the parties agreed would constitute a default: "Default. If [Hutzenbiler] fails to perform any of the covenants or promises called for hereunder, such failure shall, at the election of [RJC], constitute a default in performance of this agreement."
¶29 Notwithstanding, a security agreement may provide debtors with an opportunity to cure a default, acting to reverse the events that led to it. When a debtor cures a default, the debtor returns both parties to their pre-default positions. See In re Taddeo , 685 F.2d 24, 26-27 (2d Cir. 1982) ("Curing a default commonly means taking care of the triggering event and returning to pre-default conditions. The consequences are thus nullified."). Accordingly, an effective cure eliminates a default and its attendant consequences. After a debtor cures, the debtor is simply no longer in default. In re Entz-White Lumber & Supply, Inc. , 850 F.2d 1338, 1342 (9th Cir. 1988) (holding that after a debtor cures the default, the debtor "is entitled to avoid all consequences of the default ...."). Courts sometimes refer to the period of time the security agreement allows the debtor to cure a default as a "cure period." See Rathblott v. PeopleStrategy, Inc., 2016 WL 861348, *3, 2016 U.S. Dist. LEXIS 28864, *8-9 (E.D. Pa. 2016).
¶30 The 2010 Security Agreement provides the following cure period: "If [Hutzenbiler] fails to cure any such default within THIRTY(30) days after written notice thereof to [Hutzenbiler], [RJC] may, without further notice or period of grace, declare the entire unpaid balance of ***261 the purchase price, principal and accrued interest, immediately due and payable." In other words, if Hutzenbiler defaulted-for example, by failing to make a payment-the 2010 Security Agreement gave Hutzenbiler thirty days to cure the default before RJC could accelerate her outstanding debt. And once Hutzenbiler cured it, she was no longer in default.
¶31 In the District Court, while the parties disputed whether Hutzenbiler was in default when she signed the 2015 Agreement-a legal conclusion-they did not dispute any material facts. Specifically, they did not dispute Hutzenbiler's payment history. Hutzenbiler failed to make timely payments several times over the course of her relationship with RJC.
*385 She ultimately made every payment within 30 days of the due date, though, curing each default. She wrote a check for what would become her final payment to RJC on November 23, 2015. After RJC deposited Hutzenbiler's check, Hutzenbiler's account was current, and the next payment was not due under the terms of the 2010 Security Agreement until December 19, 2015. That fact is crucial-because Hutzenbiler's account was current, she was not in default when she executed the 2015 Agreement. Through the 2015 Agreement, Hutzenbiler agreed to transfer ownership of the mobile home to RJC in exchange for terminating the 2010 Security Agreement and forgiving the remaining balance Hutzenbiler owed RJC. And Hutzenbiler executed the 2015 Agreement when she was not in default-when she and RJC shared more balanced positions of bargaining power. Accordingly, I would hold Hutzenbiler is not entitled to whatever surplus RJC derived from the mobile home's sale.
¶32 Finally, even if Hutzenbiler was in default, I would hold Hutzenbiler and RJC executed a strict foreclosure under § 30-9A-620, MCA, following similar reasoning from my dissent in Kapor . See Kapor , ¶¶ 46-61 (McKinnon, J., dissenting). In the 2015 Agreement, the phrase "releasing myself and removing my name off the contract currently in place with RJC" is clear and unambiguous language indicating the parties were agreeing to release Hutzenbiler from her obligations and terminate their contract. By holding that RJC did not consent to accepting the mobile home in satisfaction of Hutzenbiler's obligation, the Court once again elevates form over substance, as it did in Kapor . See Kapor , ¶¶ 49, 54, 61 (McKinnon, J., dissenting). Even if the 2015 Agreement's language is ambiguous, the surrounding circumstances-just like the circumstances in Kapor -indicate Hutzenbiler was attempting to give up any rights she had in the mobile home, transfer her rights to RJC, and terminate the security agreement with RJC, just like a debtor would in strict foreclosure. The ***262 2015 Agreement could have no other purpose but to relieve the parties from the terms of the security agreement. Like Kapor , this case simply involves a debtor and a creditor, through a signed agreement, attempting to consent to a transfer of collateral to the creditor in full satisfaction of the debtor's obligation. See § 30-9A-620, MCA. The Court, however, renders the 2015 Agreement meaningless.
¶33 From the record before the Court, including the 2010 Security Agreement and Hutzenbiler's payment history, Hutzenbiler was not in default when she executed the 2015 Agreement. I disagree with the Court that remand is necessary to resolve the issue. Hutzenbiler is not entitled to any surplus RJC derived from the mobile home's sale under Part 6, and specifically §§ 30-9A-615 and -616, MCA. Furthermore, even if Part 6 applies, Hutzenbiler and RJC executed a strict foreclosure. I would affirm the District Court's conclusion that Hutzenbiler was not entitled to a surplus. I dissent.
Justice Jim Rice and Justice Dirk Sandefur join in the dissenting Opinion of Justice McKinnon.